SEDGWICK LLP
DENNIS G. ROLSTAD, SBN 150006
dennis.rolstad@sedgwicklaw.com
JOEL A. MORGAN, SBN 262937
joel.morgan@sedgwicklaw.com
333 Bush Street, 30th Floor
San Francisco, California 94104-2834
Telephone: (415) 781-7900
Facsimile: (415) 781-2635

Attorneys for Plaintiff
HCC LIFE INSURANCE COMPANY

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HCC LIFE INSURANCE COMPANY, an Indiana corporation,<br><br>           Plaintiff,<br><br>      v.<br><br>KEVIN CONROY, LINDA CONROY.<br><br>           Defendant. | CASE NO. **'15CV2897 BEN BLM**<br><br>**HCC LIFE INSURANCE COMPANY'S COMPLAINT FOR RESCISSION, MISREPRESENTATION, AND DECLARATORY JUDGMENT**<br><br>**[JURY DEMAND INDORSED HEREON, FED.R.CIV.P. 38]** |

NOW COMES plaintiff HCC Life Insurance Company ("HCC Life") and, for its complaint against defendants Kevin Conroy and Linda Conroy, alleges as follows:

## JURISDICTION AND VENUE

1.      Jurisdiction of this action is founded upon 28 U.S.C. § 1332, as the parties are citizens of different states, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

2.      Venue is proper in the Southern District of California because defendants resided in that District when they applied for the insurance certificate at issue, are believed to still reside in that District, and the insurance claim at issue arose in that District.

## PARTIES

3.      Plaintiff HCC Life is, and at all times mentioned in this Complaint was, an Indiana corporation with its principal place of business in Georgia.

-1-

COMPLAINT FOR RESCISSION, MISREPRESENTATION, DECLARATORY JUDGMENT, AND INDEMNITY; JURY DEMAND

1    4.    HCC Life is informed and believes that defendants Kevin Conroy and Linda

2  Conroy are individuals residing in San Diego, California.

3                    <u>PRELIMINARY ALLEGATIONS</u>

4    5.    On or about July 25, 2014, defendants Kevin Conroy and Linda Conroy submitted

5  an application to HCC Life for a Short Term Major Medical Insurance Certificate to provide

6  certain medical coverage under an insurance policy issued to Consumer Benefits of America ("the

7  Application").  The Application was accompanied by a Dependent Medical Questionnaire ("the

8  Questionnaire").  The Application and the Questionnaire were both signed by Kevin Conroy and

9  Linda Conroy and bear their electronic signatures.

10    6.    The Application and the Questionnaire contain identical Medical Questions to be

11  answered by the applicants, and both explicitly state that "If you have answered 'Yes' to questions

12  1 through 4 or 'No' to question 5 above, coverage cannot be issued."  Question 3 states:

13

14          Within the last 5 years have you been diagnosed, treated, or taken

15          medication for any of the following:  cancer or tumor, stroke, heart

16          disease including heart attack, chest pain or had heart surgery,

17          COPD (chronic obstructive pulmonary disease) or emphysema,

18          Crohn's disease, liver disorder, degenerative disc disease or

19          herniation/bulge, rheumatoid arthritis, kidney disorder, diabetes,

20          degenerative joint disease of the knee, alcohol abuse or chemical

21          dependency, or any neurological disorder?

22    7.    Above the signatures of Kevin Conroy and Linda Conroy on the Application and

23  the Questionnaire is a section entitled "Authorization" which states in part that:

24

25          I hereby request coverage under the insurance issued to the

26          Consumer Benefits of America Association and underwritten by

27          HCC Life Insurance Company.  I understand this insurance contains

28          a Pre-existing Condition exclusion, a Pre-certification Penalty and

SF/82601870v1

Sedgwick

other restrictions and exclusions.  I agree that coverage will not
become effective for me or any dependent whose medical status,
prior to the effective date, has changed and therefore results in a
"yes" answer to any of the medical questions on this application.  If
my medical status changes in this way, coverage will be declined for
all individuals included on this application.

\*       \*       \*

Fraud Warning:  Any person who knowingly and with intent to
injure defraud, or deceive any insurance company or other person
submits an insurance application or statement of claim containing
any materially false, incomplete or misleading information may be
committing a crime and may be subject to civil or criminal penalties.

8.      In response to Question 3 on the Application and the Questionnaire, Kevin Conroy and Linda Conroy answered by checking the box marked "No," representing and indicating among other things that neither one within the last five years had been diagnosed, treated or taken medication for degenerative disc disease, herniated or bulging disc, or alcohol abuse.

9.      Shortly thereafter, Kevin Conroy and Linda Conroy repeated and affirmed their representations in a verification telephone call with Bjorn, a representative with the verification department.  During the call Bjorn stated that the call was to confirm the purchase of a short-term medical plan, Bjorn asked Kevin Conroy and Linda Conroy various questions, and he specifically told Kevin Conroy and Linda Conroy that the questions were for all proposed insureds.

10.     The questions Bjorn asked Kevin Conroy and Linda Conroy included medical questions, and he informed Kevin Conroy and Linda Conroy that the "medical questions will apply to all family members applying for coverage."  Bjorn further asked Kevin Conroy and Linda Conroy:  "You do understand if you falsify or neglect to answer any question accurately this will nullify the application and abort all benefits of the policy?  Is this correct?"  Linda Conroy responded "Yes" on behalf of Kevin Conroy and Linda Conroy.

SF/82601870v1

-3-

COMPLAINT FOR RESCISSION, MISREPRESENTATION, DECLARATORY JUDGMENT, AND INDEMNITY;
JURY DEMAND

1    11.    During the verification call Bjorn further specifically asked Kevin Conroy and

2   Linda Conroy the following:

> Within the last five years has any applicant been diagnosed, treated
> or taken medication for any of the following conditions:  cancer or
> tumor, stroke, heart disease including heart attack, chest pain or had
> heart surgery, COPD or emphysema, Crohn's disease, liver disorder,
> degenerative disc disease or herniation bulge, rheumatoid arthritis,
> kidney disorder, diabetes, degenerative joint disease of the knee,
> alcohol abuse, chemical dependency, or any neurological disorder?

Linda Conroy responded "No" on behalf of Kevin Conroy and Linda Conroy, thus representing
and indicating among other things that neither Kevin Conroy or Linda Conroy within the last five
years had been diagnosed, treated or taken medication for degenerative disc disease, herniated or
bulging disc, or alcohol abuse.

    12.    Based on these representations made by Kevin Conroy and Linda Conroy, HCC
Life issued a Certificate of Insurance Providing Short Term Major Medical Insurance for a six
month period beginning August 1, 2014 ("the Certificate").  The Certificate was issued pursuant to
all of the terms, conditions, limitations, and exclusions contained therein.  A true and correct copy
of the Certificate is attached this Complaint as Exhibit "A" and incorporated herein by this
reference.

    13.    The questions asked by HCC Life in the Application and the Questionnaire, and
during the verification call, were important and material to HCC Life in determining whether this
was a risk that HCC Life was willing to undertake and what premium would be appropriate to
charge for the coverage provided.

    14.    HCC Life is informed and believes, and on that basis alleges, that the information
in the Application and the Questionnaire, and the statements made during the verification call by
Kevin Conroy and Linda Conroy, indicating and representing that Kevin Conroy had not within
the last five years been diagnosed, treated or taken medication for degenerative disc disease,

-4-

COMPLAINT FOR RESCISSION, MISREPRESENTATION, DECLARATORY JUDGMENT, AND INDEMNITY;
JURY DEMAND

Sedgwick LLP

1    herniated or bulging disc, or alcohol abuse, were false or materially incomplete.  The information

2    and statements were false or materially incomplete in that Kevin Conroy and Linda Conroy failed

3    to disclose, misrepresented, or concealed that within the prior five years Kevin Conroy had been

4    diagnosed, treated, or taken medication for degenerative disc disease, herniated or bulging disc,

5    and/or alcohol abuse.

6         15.    HCC Life is informed and believes that Kevin Conroy and Linda Conroy knew that

7    the information provided in the Application and the Questionnaire, and their statements made

8    during the verification call, including those referenced above, were incorrect or incomplete.  Had

9    HCC Life known that Kevin Conroy and Linda Conroy's responses to the Application and the

10   Questionnaire, and the statements made during the verification call by Kevin Conroy and Linda

11   Conroy, concealed facts and included misrepresentations, HCC Life would not have issued the

12   Certificate, or would have issued the Certificate subject to materially different terms and

13   conditions.

14                        <u>FIRST CLAIM FOR RELIEF</u>

15                (Rescission – California Insurance Code § 330, *et seq.*)

16        16.    For its first claim for relief, HCC Life incorporates herein by reference, as if fully

17   restated, paragraphs 1 through 15 above.

18        17.    HCC Life sent a letter to Kevin Conroy dated January 30, 2015, in which HCC Life

19   informed him that it had come to HCC Life's attention through his medical claims submissions and

20   HCC Life's review of records from the treating physician that he misrepresented his health in

21   response to the questions asked by HCC Life.  HCC Life stated that it must rescind the Certificate

22   and it returned to Kevin Conroy and Linda Conroy the full premium for the Certificate.

23        18.    On April 1, 2015, Kevin Conroy through counsel submitted a complaint and

24   request for assistance to the California Department of Insurance complaining of the intended

25   rescission.  The California Department of Insurance, following review of this matter, determined

26   on or about October 21, 2015 that it would not order reinstatement of the Certificate and that Mr.

27   Conroy performed an act or practice constituting fraud or made an intentional misrepresentation of

28   material fact.

COMPLAINT FOR RESCISSION, MISREPRESENTATION, DECLARATORY JUDGMENT, AND INDEMNITY;
JURY DEMAND

SF/82601870v1

19.     HCC Life intends service of the Summons and Complaint in this action to serve as further formal notice to Kevin Conroy and Linda Conroy of rescission of the Certificate.  HCC Life further provides to Kevin Conroy and Linda Conroy notice of their right to request review by the California Insurance Commissioner while noting that the Insurance Commissioner has already reviewed this matter.

20.     HCC Life seeks an order rescinding the Certificate issued to Kevin Conroy and Linda Conroy so that it is null and void *ab initio*.

<u>SECOND CLAIM FOR RELIEF</u>

(Intentional Misrepresentation)

21.     For its second claim for relief, HCC Life incorporates herein by reference, as if fully restated, paragraphs 1 through 20 above.

22.     Kevin Conroy and Linda Conroy represented that Kevin Conroy had not within the prior five years been diagnosed, treated or taken medication for degenerative disc disease, herniated or bulging disc, or alcohol abuse.

23.     These representations were false.  The true facts, at the time Kevin Conroy and Linda Conroy signed the Application and the Questionnaire, and subsequently affirmed their representations during the verification call, were that within the prior five years Kevin Conroy had been diagnosed, treated or taken medication for degenerative disc disease, herniated or bulging disc, and/or alcohol abuse.

24.     HCC Life justifiably relied upon these representations in issuing the Certificate. Had HCC Life known the true facts, it would not have issued the Certificate, or would have issued the Certificate subject to materially different terms and conditions.

25.     HCC Life has been damaged in that Kevin Conroy, and Kevin Conroy's medical providers, claim that there is coverage under the Certificate for medical expenses incurred by Kevin Conroy.

1

THIRD CLAIM FOR RELIEF

2

(Declaratory Judgment -- No Duty to Provide Coverage)

3    26.    For its third claim for relief, HCC Life incorporates herein by reference, as if fully

4  restated, paragraphs 1 through 25 above.

5    27.    The Certificate states, in part, as follows:

6  **PART II – ELIGIBILITY AND EFFECTIVE DATE OF INSURANCE**

7      **Coverage will be effective for an Insurance and his Eligible Dependent(s)
        as of the approved Effective Date, provided:**

8    **1.  The Insured meets the eligibility requirements set forth in the Master
         Application and the Policy;**

9

10                                    *   *   *

11    28.    HCC Life contends that the Certificate does not provide coverage to Kevin Conroy

12  for any purpose and that no insurance proceeds are payable to Kevin Conroy or his medical

13  providers due to Kevin Conroy and Linda Conroy's intentionally false and fraudulent statements,

14  and that Kevin Conroy did not meet the eligibility requirements for the Certificate.

15    29.    On information and belief, Kevin Conroy and Linda Conroy, or persons purporting

16  to claim through them, contend that the Certificate does provide coverage.

17    30.    An actual controversy has arisen between HCC Life and Kevin Conroy and Linda

18  Conroy as to whether the Certificate provides coverage the medical expenses incurred by Kevin

19  Conroy.

20    31.    A judicial determination is necessary and appropriate at this time so that the parties

21  may ascertain their rights and duties as aforementioned.  Said controversy is incapable of

22  resolution without judicial adjudication.  HCC Life has no plain, speedy, or adequate remedy at

23  law, and declaratory judgment is appropriate under these circumstances.

24                              FOURTH CLAIM FOR RELIEF

25                                 (Equitable Indemnity)

26    32.    For its fourth claim for relief, HCC Life incorporates herein by reference, as if fully

27  restated, paragraphs 1 through 31 above.

28

SF/82601870v1

COMPLAINT FOR RESCISSION, MISREPRESENTATION, DECLARATORY JUDGMENT, AND INDEMNITY;
JURY DEMAND

Sedgwick LLP

33.     If HCC Life is found to be liable for any medical expenses that Kevin Conroy may have incurred, then HCC Life is informed and believes that Kevin Conroy and Linda Conroy have an equitable obligation to indemnify HCC Life because Kevin Conroy and Linda Conroy in response to questions asked by HCC Life concealed material facts and made material misrepresentations, as described above.  Accordingly, as required by law, HCC Life is entitled to full equitable indemnity from Kevin Conroy and Linda Conroy for any and all damages, judgments, settlement, or other awards recovered from HCC Life, and for any other loss HCC Life may sustain in this action in any manner because of the conduct of Kevin Conroy and Linda Conroy, which conduct was the actual cause of such loss.

WHEREFORE, plaintiff HCC Life Insurance Company prays for relief as follows:

1.     For a judgment that the Certificate is rescinded and null and void *ab initio* because of Kevin Conroy and Linda Conroy's misrepresentations to and concealments of material facts from HCC Life;

2.     For a judgment that the rescission of the Certificate bars any and all coverage under the Certificate;

3.     For a judgment that, in the event the Certificate is not rescinded, the Certificate does not provide coverage for medical expenses incurred by Kevin Conroy.

4.     For a judgment that HCC Life is entitled to full indemnity from Kevin Conroy and Linda Conroy for any and all damages, judgments, settlement, loss, or other awards recovered from HCC Life by anyone as a result of the Certificate.

5.     On all causes of action, for interest, including prejudgment interest;

6.     On all causes of action, for costs herein; and

1          7.       For such other and further relief as the Court deems to be just and proper.

2

3    DATED:  December 23, 2015          SEDGWICK LLP

4

5                                       By: *s/ Dennis G. Rolstad*
                                            Dennis G. Rolstad
6                                           Sedgwick LLP
                                            Attorneys for Plaintiff
7                                           HCC LIFE INSURANCE COMPANY

8

9                             **JURY TRIAL DEMAND**

10
         Plaintiff HCC Life Insurance Company hereby demands a trial by jury in this action.
11
     DATED:  December 23, 2015          SEDGWICK LLP
12

13                                      By: *s/ Dennis G. Rolstad*
                                            Dennis G. Rolstad
14                                          Sedgwick LLP
                                            Attorneys for Plaintiff
15                                          HCC LIFE INSURANCE COMPANY

16

17

18

19

20

21

22

23

24

25

26

27

28

SF/82601870v1

COMPLAINT FOR RESCISSION, MISREPRESENTATION, DECLARATORY JUDGMENT, AND INDEMNITY;
JURY DEMAND

# EXHIBIT A

**HCC LIFE INSURANCE COMPANY**
**225 TownPark Drive, Suite 350**
**Kennesaw, Georgia 30144**
**866-400-7102**

**CERTIFICATE OF INSURANCE**
**PROVIDING SHORT TERM MAJOR MEDICAL INSURANCE**

Group Policy No. STM600-1 ("the policy"), has been issued to Consumer Benefits of America which we will refer to as "the Policyholder". We will refer to HCC Life Insurance Company as "the Company", "we", "us", "our".

The policy was delivered in Missouri and will be governed by the laws thereof.

This Certificate of Insurance is evidence of the Insured's insurance under the policy and of its benefits. Everything contained in this Certificate of Insurance is subject to the provisions, definitions, and exceptions in the policy. The policy is on file with the Policyholder and may be examined at any reasonable time. Only one of our executive officers can authorize a change of the policy.

This Certificate replaces all Certificates and Certificate Riders, if any, previously issued to the Insured under the policy.

Signed for HCC Life Insurance Company:

President:

Corporate Secretary:

**THIS CERTIFICATE IS EVIDENCE OF A CONTRACT**
**BETWEEN THE POLICYHOLDER AND THE COMPANY**
**READ IT CAREFULLY**

For service or complaints about this policy, please address any inquiries to the address shown above or call 866-400-7102.

## TABLE OF CONTENTS

PART I GENERAL DEFINITIONS ................................................................ Page 3

PART II ELIGIBILITY AND EFFECTIVE DATE OF INSURANCE ....................... Page 7

PART III TERMINATION OF INSURANCE ..................................................... Page 8

PART IV PREMIUMS ........................................................................... Page 10

PART V DESCRIPTION OF MEDICAL EXPENSES ...................................... Page 11

PART VI EXCLUSIONS........................................................................ Page 18

PART VII COORDINATION OF BENEFITS............................................... Page 22

PART VIII CLAIM PROVISIONS ............................................................ Page 25

PART IX GENERAL PROVISIONS ....................................................... Page 27

PART X SCHEDULE OF BENEFITS ............................................... Page 28

OPTIONAL BENEFIT RIDERS, IF ANY

AMENDMENT RIDERS, IF ANY

**NOTE: NO CONTINUOUS COVERAGE. This Certificate of insurance provides coverage for a short term duration only. It is not renewable.**

## PART I – GENERAL DEFINITIONS

"Accident" means a sudden, unforeseeable event that causes injury to one or more Covered Persons.

"Complications of Pregnancy" means:
1.   Conditions requiring Inpatient treatment (when pregnancy is not terminated);
2.   Whose diagnoses are distinct from pregnancy but are adversely affected or caused by pregnancy, such as hyperemesis gravidarum, preeclampsia, acute nephritis, nephrosis, cardiac decompensation, missed abortion and similar medical and surgical conditions of comparable severity, but shall not include false labor, occasional spotting, Doctor prescribed rest during the period of pregnancy, morning Sickness, and other similar conditions associated with the management of a difficult pregnancy not constituting a nosologically distinct complication of pregnancy; and
3.   Non-scheduled or emergency cesarean section, ectopic pregnancy that is terminated, and spontaneous termination of pregnancy that occurs during a period of gestation in which a viable birth is not possible.

"Congenital Condition" means a disease or other anomaly existing at or before birth, whether acquired during development or by heredity.

"Coverage Period" means the length of time which the Insured selected in the Insured's application and approved by us, not to exceed a/an 6 [Six] month period commencing on the Effective Date. The Insured's Coverage Period is shown in the Schedule of Benefits.

"Covered Person" means an Insured and his eligible dependents for whom coverage is in effect under the policy, as described in Part II – Eligibility and Effective Date of Insurance Provisions and the Schedule of Benefits.

"Custodial or Convalescence Care" means any care that is provided to a Covered Person who is disabled and needs help to support the essential activities of daily living when the Covered Person is not under active and specific medical, surgical, or psychiatric treatment that will reduce the disability to the extent necessary for the person to perform the essentials of daily living on his own.

"Deductible" means the amount of covered expenses that must be paid by a Covered Person before benefits are payable under the policy. This amount applies separately to each Covered Person and must be satisfied each Coverage Period.

"Doctor" means any duly licensed practitioner who is recognized by the law of the state in which treatment is received as qualified to perform the service for which claim is made.

"Eligible Dependent" means:
1.   The Insured's lawful spouse; and
2.   The Insured's unmarried children who are less than age 19. An unmarried child who is less than age 25 may also be included if the child is enrolled full-time in an accredited school or college.

Dependent children may include stepchildren, foster children, legally adopted children, children of adopting parents pending finalization of adoption procedures, and children for whom coverage has been court-ordered.

Dependent children (other than those for whom coverage has been court-ordered) must be primarily dependent on the Insured for principal support and maintenance.

Coverage for an unmarried dependent child who is:
A.  incapable of self sustaining employment by reason of a physically or mentally disabling injury, illness or condition; who became so incapacitated prior to the attainment of the limiting age set forth above, and
B.  chiefly dependent upon the Insured for support and maintenance, shall not terminate. Coverage shall continue as long as the certificate remains in force and the dependent is disabled. Proof of such incapacity and dependency must be furnished to Us within sixty (60) of receipt of notice by Us that such coverage will terminate. We will provide such notice at least 90 days prior to the date the Dependent child attains the limiting age. Continued proof may be requested, but not more frequently than once a year.

"Durable Medical Equipment" means medical equipment that can withstand repeated use, is prescribed by a Physician, and is appropriate for use in the home. Covered DME is limited to a standard basic Hospital bed and/or a standard basic wheel chair.

"Effective Date" means the date the Insured's (and Eligible Dependents' if applicable) coverage under the policy is effective.

"Experimental Treatment" means in Our discretion a treatment, drug, device, procedure, supply or service and related services (or any portion thereof, including the form, administration or dosage) for a particular diagnosis or condition when any one of the following exists:
1.  The treatment, drug, device, procedure, supply or service is in any clinical trial or a Phase I, II or III trial.
2.  The treatment, drug, device, procedure, supply or service is not yet fully approved or recognized (for other than experimental, investigational, research or clinical trial purposes) by the National Cancer Institute (NCI), Food & Drug Administration (FDA), or other pertinent governmental agency or professional organization.
3.  The results are not proven through controlled clinical trials with results published in peer-reviewed English language medical journals, to be of greater safety and efficacy than conventional treatment, in both the short and long term.
4.  The treatment, drug, device, procedure, supply or service is not generally accepted medical practice in the state where the Covered Person resides or as generally accepted throughout the United States as determined in Our discretion, by reference to any one or more of the following: peer-reviewed English-language medical literature, consultation with physicians, authoritative medical compendia, the American Medical Association, or other pertinent professional organization or governmental agency.
5.  The treatment, drug, device, procedure, supply or service is described as investigational, experimental, a study, or for research or the like in any consent, release or authorization which the Covered Person, or someone acting on his or her behalf, may be required to sign.
The fact that a procedure, service, supply, treatment, drug, or device may be the only hope for survival will not change the fact that it is otherwise experimental in nature.

"Extended Care Facility" means an institution, other than a Hospital, operated and licensed pursuant to law, that provides:

1.  Permanent and full-time facilities for the continuous skilled nursing care of three (3) or more sick or injured persons on an Inpatient basis during the convalescent stage of their illnesses or injuries;
2.  Full-time supervision of a Doctor;
3.  Twenty-four (24) hour a day nursing service of one or more Nurses; and
4.  Is not, other than incidentally, a rest home or a home for custodial care or for the aged. Extended Care Facility does not include an institution that primarily engages in the care and treatment of drug addiction or alcoholism.

"Home Health Care Agency" means an entity licensed by state or local law operated primarily to provide skilled nursing care and therapeutic services in an individual's home and:
1.  Which maintains clinical records on each patient;
2.  Whose services are under the supervision of a Doctor or a licensed graduate registered nurse (RN); and
3.  Which maintains operational policies established by a professional group including at least one Doctor and one licensed graduate registered nurse (RN).

"Home Health Care Plan" means a program for continued care and treatment of an individual established and approved in writing by the individual's attending Doctor. As part of the plan, an attending Doctor must certify that proper treatment of the Injury or Sickness would require continued confinement in a Hospital in the absence of the services and supplies.

"Hospital" means an institution operated by law for the care and treatment of injured or sick persons; has organized facilities for diagnosis and surgery or has a contract with another hospital for these services; and has 24-hour nursing service. Hospital excludes any institution that is primarily a rest home, nursing home, convalescent home, a home for the aged, an alcoholism or drug addiction treatment facility.

"Immediate Family" means the parents, spouse, children, or siblings of a Covered Person, or any person residing with a Covered Person.

"Injury" means accidental bodily Injury of a Covered Person:
1.  Caused by an Accident; and
2.  That results in covered loss directly and independently of all other causes.

All Injuries sustained in one Accident, including all related conditions and recurring symptoms of the Injuries, will be considered one injury.

"Inpatient" means a person who incurs medical expenses for at least one day's room and board from a Hospital.

"Insured" means a person who meets the eligibility requirements for an Insured as stated in the Master Application and the policy, and whose coverage under the policy has become effective and has not terminated.

"Medically Necessary" means the care, service or supply is:
1.  Prescribed by a Doctor for the diagnosis or treatment of an Injury or Sickness; and
2.  Appropriate, according to conventional medical practice for the Injury or Sickness in the locality in which the care, service or supply, is given.

"Mental and Nervous Disorder" means a "biologically-based" mental disorder, including Schizophrenia, Schizoaffective disorder, Major depressive disorder, Bipolar disorder, Paranoia and other psychotic disorders, Obsessive-compulsive disorder, Panic disorder, Delirium and dementia, Affective disorders, and any other "biologically-based" mental disorders appearing in the most recent edition of the Diagnostic and Statistical Manual of the American Psychiatric Association (the "DSM").

"Outpatient" means a person who incurs medical expenses at Doctor's offices and freestanding clinics, and at Hospitals when not admitted as an Inpatient.

"Regular and Customary Activities" means an Insured Person can carry on a substantial part of the standard and commonly practiced activities of a person in good health of the same sex and age. Activities performed while confined in a Hospital or other medical institution may not be used to meet this requirement.

"Routine Physical Exam" means examination of the physical body by a Doctor for preventive or informative purposes only, and not for the diagnosis or treatment of any condition.

"Sickness" means Sickness or disease of a Covered Person that:
1.    Is treated by a Doctor while the person is covered under the policy; and
2.    Results directly and independently of all other causes in loss covered by the policy.

"Substance Abuse" means the overindulgence in and dependence on a psychoactive leading to effects that are detrimental to the individual's physical health or mental health, or the welfare of others.

"Surgery or Surgical Procedure" means an invasive diagnostic procedure; or the treatment of Injury or Sickness by manual or instrumental operations performed by a Doctor while the patient is under general or local anesthesia.

"Total Disability" (or "Totally Disabled") means the Insured is disabled and prevented from performing the material and substantial duties of his or her occupation. For Dependents, "Totally Disabled" means the inability to perform a majority of the normal activities of a person of like age in good health.

"Urgent Care Center" means a medical facility separate from a hospital emergency department where ambulatory patients can be treated on a walk-in basis without an appointment and receive immediate, non-routine urgent care for an Injury or Sickness presented on an episodic basis.

"Usual and Customary" charges means the following:
1.    A usual fee is defined as the charge made for a given service by a Doctor to the majority of his or her patients; and
2.    A customary fee is one that is charged by the majority of Doctors within a community for the same services. All benefits are limited to Usual and Customary charges.

## PART II – ELIGIBILITY AND EFFECTIVE DATE OF INSURANCE

Coverage will be effective for an Insured and his Eligible Dependent(s) as of the approved Effective Date, provided:

1. The Insured meets the eligibility requirements set forth in the Master Application and the Policy;
2. The Insured's Application is approved by Us;
3. The first premium payment is received on or before the date the Insured's Application is approved by Us;
4. The Insured is not confined at home or in a Hospital or medical institution as of the Effective date; and
5. The Insured is engaging in his Regular and Customary Activities as of the Effective date.

If the Insured is not engaged in his Regular and Customary Activities or is confined in a Hospital or medical institution on the Effective Date, coverage will begin the first day he can engage in his Regular and Customary Activities and is not confined in a Hospital or medical institution.

The Company will require satisfactory evidence of insurability for each Insured and Eligible Dependent.

**Newborn Child Coverage:** A child of the Insured born while the policy is in force is covered for Injury and Sickness (including necessary care and treatment of congenital defects, birth abnormality and premature birth), as well as routine newborn care for the first 31 days. The child is covered from the moment of birth until the 31st day of age. A notice of birth together with additional premium must be submitted to us within 31 days of the birth in order to continue coverage for Injury and Sickness beyond the initial 31-day period.

**Adopted Children Coverage**: A minor child who comes under the charge, care and control of the Insured while the policy is in force is covered for Injury and Sickness provided the Insured files a petition to adopt. The coverage of such child will be the same as provided for other members of the Insured's family. Such child shall be covered from the date of placement in the Insured's home if the Insured applies for coverage and pays any required premium within 31 days after the date of placement. However, coverage shall begin at the moment of birth if the petition for adoption, application for coverage and payment of premium occurs within 31 days after the child's birth. Such child's coverage will not be subject to any pre-existing conditions limitation provided by the policy. Coverage for such minor child will continue unless the petition for adoption is dismissed or denied.

## PART III - TERMINATION OF INSURANCE

Coverage of a Covered Person under the Policy shall automatically terminate on the earliest of

the following dates:

1.   The date the Coverage Period expires;

2.   The first day of the month coinciding with or following the date other hospital, major medical, group health or other medical insurance coverage becomes effective for a Covered Person;

3.   The end of the last period for which the last required premium payment was made for the Insured's or Covered Person's insurance;

4.   The date a Covered Person receives the Coverage Period Maximum Benefit Amount;

5.   The date the Covered Person enters the armed forces of any country, state or international organization, other than for reserve duty of 30 days or less;

6.   The premium due date that coincides with or next follows the date on which the Insured is no longer eligible;

7.   For a Dependent spouse, the first day of the month following the date of divorce or legal separation from the Insured; or

8.   The date We specify that the Covered Person's insurance is terminated because of:

   A.   Failure to provide any signed release, consent, assignment or other documents requested by Us;

   B.   Failure to fully cooperate with Us in the administration of the Policy;

   C.   Material misrepresentation, fraud, or omission of information on any application form, or in requesting the receipt of benefits under the Policy; or

   D.   Misuse of the Covered Person's identification card.

At the death of an Insured, all rights and privileges as a Covered Person under the Policy will transfer to the surviving Dependent spouse. The Dependent spouse will then be considered an Insured instead of a Dependent. In the event the Dependent spouse remarries, coverage under the Policy for the Dependent Spouse and Dependent child(ren), if any, will end on the first day of the month following the date of that marriage. If no surviving Dependent spouse, or at the death of a surviving Dependent spouse, all rights and privileges as a Covered Person under the Policy will transfer to each Dependent child, if any, and he will be considered the Insured instead of a Dependent.

If the Insured selected the Pay In Advance option in the Insured's Application and We received all required premium for the Coverage Period, premium will be reimbursed to the Insured for the period of time, if any, between the date coverage terminates in accordance with the above provisions and the end of that Coverage Period.

**Extension of Benefits**

If a covered Bodily Injury or Sickness commences while the Policy is in force as to a Covered

Person, benefits otherwise payable under the Policy for the Injury or Sickness causing the Total Disability will also be paid for any Eligible Expenses incurred after the termination of insurance for a Covered Person if, from the date of such termination to the date such expenses are incurred, the Covered Person is Totally Disabled by reason of such Injury or Sickness. Such benefits shall be payable only during the continuance of such disability until the earlier of:

1.   The date the Total Disability ends;
2.   The date when treatment for the Total Disability is no longer required;

3.     The date following a time period equal to the Covered Person's Coverage Period, with a minimum of thirty (30) days not to exceed a maximum of ninety (90) days;

4.     The date the Covered Person becomes eligible for any other group insurance plan providing coverage for the same conditions causing the Total Disability; or

5.     The date the Coverage Period Maximum Benefit amount has been reached.

## PART IV - PREMIUMS

1.   Unless the Pay In Advance option has been chosen, premium due dates for an Insured will be on the Effective Date and then the same date of each following calendar month. If a month has fewer days than the scheduled premium due date, premium will be due on the last day of the month. All insurance shall be charged from and to the premium due date.

2.   If any change or clerical error affects premiums, an equitable adjustment in premiums shall be made on the premium due date next following the date of the change or the discovery of the error. Any premium adjustment that involves collecting earned premiums, or returning unearned premium shall be limited to the six (6) months immediately preceding the date of determination that the adjustment in premium should be made.

3.   Premiums shall be payable in advance to Us at Our Home Office.

4.   If the Insured has not given written notice to Us that insurance is to be terminated prior to the premium due date, a grace period of thirty-one (31) days beginning from the premium due date will be allowed for any premium after the first premium. If the Insured fails to pay premium before the grace period expires all coverage shall lapse as of the premium due date.

5.   The Policy does not share in the surplus earnings of the Company and no refund or assessment shall be made to the Policyholder, Insured, or Dependent of any excess or deficit earnings of the Company.

## PART V – DESCRIPTION OF MEDICAL EXPENSES

Subject to the Deductible, Coinsurance and other limits set forth in PART X – SCHEDULE OF BENEFITS, the Company will pay the following expenses incurred while this insurance is in effect:

1. Charges made by a Hospital for:
   A. Daily room and board and nursing services not to exceed the average semi-private room rate;
   B. Daily room and board and nursing services in Intensive Care Unit;
   C. Use of operating, treatment or recovery room;
   D. Services and supplies which are routinely provided by the Hospital to persons for use while Inpatients;
   E. Emergency treatment of an Injury, even if Hospital confinement is not required; and
   F. Emergency treatment of a Sickness; however, an additional $250 Deductible will apply to emergency room charges unless the Covered Person is directly admitted to the Hospital as an Inpatient for further treatment of that Sickness.
2. For Surgery at an Outpatient surgical facility, including services and supplies.
3. For charges made by a Doctor for professional services.
4. For charges made by a Doctor for Surgery. Charges for an assistant surgeon are covered up to 20% of the Usual and Customary charge of the primary surgeon. (Standby availability will not be deemed to be a covered charge.).
5. For dressings, sutures, casts or other supplies which are Medically Necessary and administered by or under the supervision of a Doctor, but excluding nebulizers, oxygen tanks, diabetic supplies, other supplies for use or application at home, and all devices or supplies for repeat use at home, except Durable Medical Equipment as herein defined.
6. For diagnostic testing using radiology, ultrasonographic or laboratory services
   (psychometric, intelligence, behavioral and educational testing are not included).
7. For artificial limbs, eyes or larynx, breast prosthesis or basic functional artificial limbs,
   but not the replacement or repair thereof.
8. For reconstructive surgery performed to correct or repair abnormal structures of the body caused by congenital defects, developmental abnormalities, trauma, infection, tumors, or disease:
   A. to improve function; or
   B. to create a normal appearance, to the extent possible.
9. Reconstructive breast surgery and prosthetic devices incident to a Mastectomy. Coverage will also be extended to include surgery on a non-diseased breast to establish symmetry with the diseased breast. As used in this benefit:
   A. "Mastectomy" means the surgical removal of all or part of a breast as a result of breast cancer.
   B. "Reconstructive breast surgery" means surgery performed as a result of a mastectomy to reestablish symmetry between the two breasts and includes augmentation mammoplasty, reductive mammoplasty, and mastopexy.
   Coverage for prosthetic devices and reconstructive surgery means any initial or subsequent surgeries, prosthetic devices and any Medically Necessary follow up care.
10. For radiation therapy or treatment and chemotherapy.
11. For hemodialysis and the charges by the Hospital for processing and administration of blood or blood components but not the cost of the actual blood or blood components.
12. For oxygen and other gasses and their administration by or under the supervision of a Doctor.

13.    For anesthetics and their administration by a Doctor, subject to a maximum of 20% of the benefit payable for the primary surgeon.

14.    Extended Care Facility charges for room and board accommodations; if:
- A.    The Insured is an Inpatient in that facility on the certification of the attending Doctor that the confinement is Medically Necessary;
- B.    The confinement commences immediately following a period of at least three (3) continuous days of Hospital confinement; and
- C.    That confinement is for the same covered Injury or Sickness that was treated during the Covered Person's confinement in the Hospital.

15.    Treatment of a Covered Person by a Home Health Care Agency under a Home Health Care Plan. Up to four (4) consecutive hours in a twenty-four (24) hour period of Home Health Care services shall be considered as one Home Health Care visit. Eligible Expenses for Home Health Care are the Maximum Allowable Charges made for the following:
- A.    Part-time skilled nursing care;
- B.    Physical therapy;
- C.    Speech therapy;
- D.    Medical supplies, drugs and medicines prescribed by a Doctor;
- E.    Laboratory services by or on behalf of the Hospital but only to the extent benefits for those services would have been paid under the Policy had the Insured Person remained Hospitalized;
- F.    Occupational therapy; and
- G.    Respiratory therapy.  However, benefits will not be paid for charges made by a Home Health Care Agency for:
- A.    Any charges excluded under the Exclusions of the certificate;
- B.    Full-time nursing care at home;
- C.    Meals delivered to the home;
- D.    Homemaker services;
- E.    Any services of an individual who ordinarily resides in the Insured's home or is a member of the Insured's immediate family; or
- F.    Any transportation services.

Benefits for Home Health Care are in lieu of any similar benefits provided under any other provision of the certificate.

16.    Local Ambulance transport necessarily incurred in connection with Injury, and Local Ambulance transport necessarily incurred in connection with Sickness resulting in Inpatient hospitalization.

17.    Dental treatment and dental surgery necessary to restore or replace natural teeth lost or damaged as a result of an Injury covered under this certificate.

18.    Medically Necessary rental of Durable Medical Equipment (limited to a standard basic hospital bed and/or a standard basic wheelchair) up to the purchase prices, not including expenses for customization and only for the portion of the cost equivalent to the Coverage Period.

19.    Physical Therapy if prescribed by a Doctor who is not affiliated with the Physical Therapy practice, necessarily incurred to continue recovery from a covered Injury or Sickness.

## Pre-Certification Requirements

1.    All hospitalizations, other Inpatient care, and Surgeries or Surgical Procedures must be Pre-certified.

2.    To comply with the Pre-certification requirements, the Covered Person must:

    A.    Contact the Company at 1-866-400-7102 as soon as possible <u>before</u> the expense is to be incurred; and

    B.    Comply with the instructions of the Company and submit any information or documents they require; and

    C.    Notify all Doctors, Hospitals and other providers that this insurance contains Pre-certification requirements and ask them to fully cooperate with the Company.

3. If the Covered Person complies with the Pre-certification requirements, and the expenses are Pre-certified, the Company will pay Eligible Medical Expenses subject to all terms, conditions, provisions and exclusions described in this certificate. If the Covered Person does not comply with the Pre-certification requirements or if the expenses are not Pre-certified:

    A.    Eligible Medical Expenses will be reduced by 50%; and

    B.    The Deductible will be subtracted from the remaining amount; and

    C.    The Coinsurance will be applied.

4. Emergency Pre-certification: In the event of an emergency Hospital admission, Pre-certification must be made within 48 hours after the admission, or as soon as is reasonably possible.

5. Pre-certification Does Not Guarantee Benefits – The fact that expenses are Pre-certified does not guarantee either payment of benefits or the amount of benefits. Eligibility for and payment of benefits are subject to all the terms, conditions, provisions and exclusions herein.

6. Concurrent Review – For Inpatient stays of any kind, the Company will Pre-certify a limited number of days of confinement. Additional days of Inpatient confinement may later be Pre-certified if a Covered Person receives prior approval.

Pre-Certification Requirements for reconstructive surgery in connection with a mastectomy shall not be required in determining length of stay in a hospital following such surgery or procedure. Only a Doctor competent to evaluate the specific clinical issues involved in the care requested, can deny a request to authorize care for reconstructive surgery.

**State Mandated Benefits.**
The following benefits are mandated by applicable state law. All benefits will be subject to any inside benefit limitations set forth below, as well as the Coverage Period Maximum Benefit amounts shown on the Schedule of Benefits.

1. **Dental Anesthesia** – Coverage shall be provided for general anesthesia for dental care for a Dependent child if an underlying medical condition requires such anesthesia to be provided in a hospital or surgery center setting. Coverage shall only include payment for:

    A.    anesthesia; and

    B.    hospital or surgery center setting charges.

The Dependent child must meet the following conditions:

    A.    be under the age of seven (7); or

    B.    be developmentally disabled, regardless of age; and

    C.    it is determined that such child's health is compromised and general anesthesia is Medically Necessary.

2. **Child Preventive Care** - Coverage shall be provided for comprehensive child preventive care consistent with the following for children 16 years of age or younger:

    A.    The recommendations for Preventive Pediatric Health Care, as adopted by the American Academy of Pediatrics of September 1987;

B.     The most current version of the Recommended Childhood Immunization Schedule/United States, jointly adopted by the:
(a)    American Academy of Pediatrics;
(b)    Advisory Committee on Immunization Practices; and
(c)    American Academy of Family Physicians;
unless the State Department of Health Services determines, within 45 days of the published date of the schedule, that the schedule is not consistent with the purposes of this benefit provision. and

C.    Include benefits for:
(a)    periodic health evaluations;
(b)    immunizations; and
(c)    laboratory services in connection with periodic health evaluations.

3    **Mammography Screening** - Coverage shall be provided for the screening and diagnosis of breast cancer based on the following:

A.    A baseline mammogram for a woman who is thirty-five (35) to forty (40) years of age;

B.    A mammogram for a woman who is forty (40) to forty-nine (49) years of age, every two years, or more frequently, based on the recommendation of the woman's Doctor;

C.    A mammogram each year for a woman who is at least fifty years (50) of age;

4.    **Laryngectomy** - Coverage shall be provided for prosthetic devices to restore speech after a laryngectomy.
As used here:
Laryngectomy means the Medically Necessary removal of the larynx.

Prosthetic devices means initial and replacement prosthetic devices, including installation accessories prescribed by a Doctor. It does not include an electronic voice producing machine.

5.    **Prostate Screenings** - Coverage shall be provided for the screening and diagnosis of prostate cancer. Coverage shall include, but not be limited to:
A.    prostate specific antigen testing; and
B.    digital rectal examinations.

Coverage does not include:
A.    radical prostatectomy;
B.    external beam radiation therapy;
C.    radiation seed implants; or
D.    combined hormonal therapy.

6.    **Cervical Cancer Screenings** - Coverage shall be provided for an annual cervical cancer screening test including a Pap test or any cervical cancer screening test approved by the FDA and recommended by a Doctor.

7.    **Cancer Screening Tests** - Coverage shall be provided for generally medically accepted cancer screening tests.

8.     **Phenylketonuria (PKU) Treatment** - Coverage shall be provided for the testing and treatment of phenylketonuria (PKU). Such coverage will include formulas and special food products that are:

   A.     part of a diet prescribed by a Doctor;
   B.     managed by a health care professional in consultation with a Doctor who specializes in the treatment of metabolic disease.

Such diet must be Medically Necessary to avoid the development of a serious physical or mental disability; or to promote normal development or function as a consequence of PKU. Coverage is only required to the extent it exceeds the cost of a normal diet.

As used here:
"Formula" means an enteral product for use at home that is prescribed or ordered by a Doctor or other authorized health care provider as Medically Necessary for the treatment of PKU.

"Special food products" means a food product that is both:
   A.     prescribed by a Doctor for the treatment of PKU and consistent with the recommendations and best practices of qualified health professionals with expertise germane to, and experience in the treatment and care of, PKU. It does not include a food that is naturally low in protein, but may include a food product that is specially formulated to have less than one gram of protein per serving; and
   B.     used in place of normal food products, such as grocery store foods , used by the general population.

9.     **Osteoporosis** - Coverage shall be provided for the diagnosis, treatment and appropriate management of osteoporosis. Coverage will include, but not be limited to, FDA approved technologies such as bone mass measurement, as deemed medically appropriate.

10.    **Severe Mental Illness/Serious Emotional Disturbances of a Child** - Coverage for Medically Necessary treatment shall be provided for:

   A.     diagnosis and treatment of severe mental illness for a Covered Person of any age; and
   B.     emotional disturbances of a child who:
      (a)     has one or more mental disorders as identified in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders, other than a primary substance use disorder or developmental disorder, that result in behavior inappropriate to such child's age according to expected development norms; and
      (b)     meets one or more of the following:
         (i)     displays psychotic features, risk of suicide, or risk of violence due to a mental disorder; or
         (ii)    meets special education eligibility requirements pursuant to California state law; or
         (iii)   has substantial impairment, as a result of the mental disorder, in at least two of the following areas: self-care, school functioning, family relationships, or ability to function in the community and either of the following occur: the child is at risk of removal from his/her home or has already been removed from the home; or the

mental disorder and impairments have been present for more than six months or are likely to continue for more than one year without treatment.

Benefits shall include charges incurred for:
1.    Outpatient services;
2.    Inpatient hospital services, including inpatient prescription drugs and
3.    Partial hospital services.

As used here:
"Severe mental illness" shall include:
1.    Schizophrenia or schizoaffective disorder; or
2.    Bipolar disorder (manic-depressive illness); or
3.    Major depressive disorder; or
4.    Panic disorder; or
5.    Obsessive-compulsive disorder; or
6.    Pervasive developmental disorder or autism; or
7.    Anorexia nervosa or bulimia nervosa.

11.    **Diabetes** - Coverage shall be provided for Medically Necessary supplies, equipment and management and treatment of insulin using diabetes, non-insulin using diabetes and gestational diabetes. Coverage shall include:
    A.    Blood glucose monitors, including glucose monitors for the visually impaired;
    B.    Blood glucose test strips, ketone urine testing strips;
    C.    Insulin pumps and related necessary supplies;
    D.    Lancets and lancet puncture devices;
    E.    pen delivery systems for the administration of insulin;
    F.    Podiatric devices to prevent or treat diabetes related complications;
    G.    Insulin syringes;
    H.    Visual aids (but not eyewear) to assist the visually impaired with proper dosing of insulin.

Coverage shall also include outpatient self-management training, education and medical nutrition therapy services necessary to enable the Covered Person to properly use the equipment and supplies listed above. Such services must be provided by an appropriately licensed or registered health care professional as prescribed by a health care professional legally authorized to prescribe the services.

12.    **AIDS Vaccine** – Coverage shall be provided for a vaccine for Acquired Immune Deficiency Syndrome (AIDS) that is approved by the FDA and recommended by the U.S. Public Health Service.

13.    **Cancer Clinical Trials** - Coverage shall be provided for routine patient costs for a Covered Person diagnosed with cancer and accepted into a phase I, phase II, phase III, or phase IV clinical trial for cancer. The Covered Person's Doctor must recommend participation in the clinical trial and determine that it will have a meaningful potential benefit. Treatment must be provided in a clinical trial that:
    A.    involves a drug that is exempt under federal regulations from a new drug application; or
    B.    is approved by one of the following:
        (a)    one of the National Institutes of Health (NIH);

      (b)    the FDA, in the form of an investigational new drug application;
      (c)    the U.S. Department of Defense; or
      (d)    the U.S. Veterans' Administration.

"Routine patient costs" means costs associated with the provision of health care services, including drugs, items, devices, and services that would otherwise be covered under the plan or contract if those drugs, items, devices, and services were not provided in connection with an approved clinical trial program, including the following:

A.    Health care services typically provided absent a clinical trial.

B.    Health care services required solely for the provision of the investigational drug, item, device, or service.

C.    Health care services required for the clinically appropriate monitoring of the investigational item or service.

D.    Health care services provided for the prevention of complications arising from the provision of the investigational drug, item, device, or service.

E.    Health care services needed for the reasonable and necessary care arising from the provision of the investigational drug, item, device, or service, including the diagnosis or treatment of the complications.

It does not include:

A.    drugs or devices not approved by the FDA and that are associated with the clinical trial;

B.    services other than health care services, such as travel, housing, companion expenses and other nonclinical expenses;

C.    any item or service that is provided solely to satisfy data collection and analysis needs and that is not used in the clinical management of the patient.

D.    health care services which, except for the fact that they are not being provided in a clinical trial, are otherwise specifically excluded under this certificate; or

E.    health care services customarily provided by the research sponsors free of charge for any enrollee in the trial.

## PART VI – EXCLUSIONS

Charges for the following treatments and/or services and/or supplies and/or conditions are excluded from coverage:

1.  Pre-existing Conditions – Charges resulting directly or indirectly from a condition for which a Covered Person received medical treatment, diagnosis, care or advice within the six (6) month period immediately preceding such person's Effective Date are excluded for the first six (6) months of coverage hereunder. A Covered Person who was covered under creditable coverage within 63 days of enrolling under this certificate shall be given credit for the period of time under such coverage toward the satisfaction of this exclusion. This exclusion does not apply to a newborn or newly adopted child who is added to coverage under this certificate in accordance with PART II – ELIGIBILITY AND EFFECTIVE DATE OF INSURANCE. Creditable Coverage means any of the following:

    A.  A group health plan; or
    B.  Health insurance coverage (care under any hospital or medical service policy or certificate; hospital or medical service plan contract; or Health Maintenance Organization (HMO); or
    C.  Individual coverage; or
    D.  Medicare; or
    E.  Medicaid; or
    F.  CHAMPUS; or
    G.  A medical care program of the Indian Health Service or of a tribal organization; or
    H.  A State health benefits risk pool; or
    I.  A health plan offered under the Federal Employees Health Benefits Program (FEHBP); or
    J.  A public health plan; or
    K.  A health benefit plan under the Peace Corps Act.

    Creditable coverage does not include accident only, credit, coverage for onsite medical clinics, disability income, Medicare supplement, long-term care insurance, dental, vision, coverage issued as a supplement to liability insurance, workers' compensation insurance or similar law, automobile medical payment insurance, or insurance under which benefits are payable with or without regard to fault and that is statutorily required to be contained in any liability insurance policy or equivalent self-insurance.

    Any coverage under which an insured was covered prior to a break in coverage of 63 consecutive days or more, not counting any waiting period or affiliation period required by any Creditable Coverage, will not be considered Creditable Coverage.

2.  Outpatient Prescription Drugs, medications, vitamins, and mineral or food supplements including pre-natal vitamins, or any over-the-counter medicines, whether or not ordered by a Doctor.
3.  Routine pre-natal care, Pregnancy, childbirth, and postnatal care. (This exclusion does not apply to "Complications of Pregnancy" as defined.)
4.  Alcoholism.
5.  Substance abuse.
6.  Charges which are not incurred by a Covered Person during his/her Coverage Period.
7.  Treatment, services or supplies, which are not administered by or under the supervision of a Doctor.
8.  Treatment, services or supplies which are not Medically Necessary as defined.
9.  Treatment, services or supplies provided at no cost to the Covered Person.

10. Charges which exceed Usual and Customary charge as defined.
11. Telephone consultations or failure to keep a scheduled appointment.
12. Consultations and/or treatment provided over the Internet.
13. Surgeries, treatments, services or supplies which are deemed to be Experimental Treatment.
14. All charges Incurred while confined primarily to receive Custodial or Convalescence Care.
15. Weight modification or surgical treatment of obesity, including wiring of the teeth and all forms of intestinal bypass surgery.
16. Modifications of the physical body in order to improve the psychological, mental or emotional well-being of the Covered Person, such as sex-change surgery.
17. Surgeries, treatments, services or supplies for cosmetic or aesthetic reasons, except for reconstructive surgery which is expressly covered under this certificate.
18. Any drug, treatment or procedure that either promotes or prevents conception including but not limited to: artificial insemination, treatment for infertility or impotency, sterilization or reversal of sterilization.
19. Any drug, treatment or procedure that either promotes, enhances or corrects impotency or sexual dysfunction.
20. Abortions, except in connection with covered Complications of Pregnancy or if the life of the expectant mother would be at risk.
21. Dental treatment, except for dental treatment that is expressly covered under this certificate.
22. Eyeglasses, contact lenses, hearing aids, hearing implants, eye refraction, visual therapy, and any examination or fitting related to these devices, and all vision and hearing tests and examinations.
23. Eye surgery, such as radial keratotomy, when the primary purpose is to correct nearsightedness, farsightedness or astigmatism.
24. Treatment for cataracts.
25. Treatment of the temporomandibular joint, except for medically necessary surgical procedures for covered conditions directly affecting the upper or lower jawbone or associated bone joints.
26. Injuries resulting from participation in any form of skydiving, scuba diving, auto racing, bungee jumping, hang or ultra light gliding, parasailing, sail planing, flying in an aircraft (other than as a passenger on a commercial airline), rodeo contests or as a result of participating in any professional, semi-professional or other non-recreational sports including boating, motorcycling, skiing, riding all-terrain vehicles or dirt-bikes, snowmobiling or go-carting.
27. Injuries or Sicknesses resulting from participation in interscholastic, intercollegiate or organized competitive sports.
28. Injury resulting from being under the influence of or due wholly or partly to the effects of alcohol or drugs, other than drugs taken in accordance with treatment prescribed by a Doctor, but not for the treatment of Substance Abuse.
29. Willfully self-inflicted Injury or Sickness.
30. Immunizations and Routine Physical Exams, except as expressly covered under this certificate or under a Rider attached to this certificate.
31. Services received for any condition caused by a Covered Person's commission of or attempt to commit a felony or to which a contributing cause was the Covered Person being engaged in an illegal occupation.
32. Speech, vocational, occupational, biofeedback, acupuncture, recreational, sleep or music therapy, holistic care of any nature, massage and kinesthapy.

33. Any services performed or supplies provided by a member of the Insured's Immediate Family.

34. Orthoptics and visual eye training.

35. Services or supplies which are not included as Eligible Expenses as described herein.

36. Care, treatment or supplies for the feet: orthopedic shoes, orthopedic prescription devices to be attached to or placed in shoes, treatment of weak, strained, flat, unstable or unbalanced feet, metatarsalgia or bunions, and treatment of corns, calluses or toenails.

37. Care and treatment for hair loss including wigs, hair transplants or any drug that promises hair growth, whether or not prescribed by a Doctor.

38. Treatment of sleep disorders.

39. Hypnotherapy when used to treat conditions that are not recognized as Mental or Nervous Disorders by the American Psychiatric Association, and biofeedback, and non-medical self-care or self-help programs.

40. Any services or supplies in connection with cigarette smoking cessation.

41. Exercise programs, whether or not prescribed or recommended by a Doctor.

42. Treatment required as a result of complications or consequences of a treatment or condition not covered under this certificate.

43. Charges for travel or accommodations, except as expressly provided for local ambulance.

44. Treatment incurred as a result of exposure to non-medical nuclear radiation and/or radioactive material(s).

45. Organ or Tissue Transplants or related services.

46. Treatment for acne, moles, skin tags, diseases of sebaceous glands, seborrhea, sebaceous cyst, unspecified disease of sebaceous glands, hypertrophic and atrophic conditions of skin, nevus.

47. Services received or supplies purchased outside the United States, its territories or possessions, or Canada.

48. Treatment for or related to any congenital condition, except as it relates to a newborn or adopted child added as a Covered Person to this certificate.

49. Spinal manipulation or adjustment.

50. Sclerotherapy for veins of the extremities.

51. Expenses during the first 6 months after the Effective Date of coverage for a Covered Person for the following (subject to all other coverage provisions, including but not limited to the Pre-existing Condition exclusion):

    A. Total or partial hysterectomy, unless it is Medically Necessary due to a diagnosis of carcinoma;

    B. Tonsillectomy;

    C. Adenoidectomy;

    D. Repair of deviated nasal septum or any type of surgery involving the sinus;

    E. Myringotomy;

    F. Tympanotomy;

    G. Herniorraphy; or

    H. Cholecystectomy.

52. Chronic fatigue or pain disorders.

53. Treatment or diagnosis of allergies, except for emergency treatment of allergic reactions.

54. Treatment, medication or hormones to stimulate growth, or treatment of learning disorders, disabilities, developmental delays or deficiencies, including therapy.

55. Kidney or end stage renal disease.

56. Joint replacement or other treatment of joints, spine, bones or connective tissue including tendons, ligaments and cartilage, unless related to a covered Injury.

57.   Expenses resulting from a declared or undeclared war, or from voluntary participation in a riot or insurrection.

58.   Expenses incurred by a Covered Person while on active duty in the armed forces. Upon written notice to Us of entry into such active duty, the unused premium will be returned to the Covered Person on a pro-rated basis.

## PART VII – COORDINATION OF BENEFITS (COB)

Some people have health care coverage through more than one medical insurance plan at the same time. COB allows these plans to work together so the total amount of all benefits will never be more than 100 percent of the allowable expenses during any coverage year. This helps to hold down the costs of health coverage.

COB does not apply to life insurance or accidental death and dismemberment benefits.

The term "plan" applies separately to each policy, contract agreement or other arrangements for benefits or services. The term "plan" also applies separately to that part of any policy, contract, agreement or other arrangements for benefits or services that coordinates its benefits with other plans and to that part that does not.

When a plan provides benefits in the form of services rather than cash payment the reasonable cash value of each service rendered will be considered to be both: (1) an allowable expense; and (2) a benefit paid.

**Definitions. "Plan"** – means any of the following which provides benefits or services for medical expenses:
1.   Any group insurance or group-type coverage, whether insured or uninsured. This includes prepayment, group practice, or individual practice coverage.
2.   Any federal, state or local governmental programs, or coverage required or provided by law. This does not include a state plan under Medicaid (Title XIX, Grants to States for Medical Assistance Programs, of the United States Social Security Act, as amended from time to time.)

Each contract or other arrangement for coverage under the above paragraphs is a separate plan. Also, if an arrangement has two parts and COB rules apply to one of the two, each of the parts is construed to mean a separate Plan.

The term "plan" does not include:
1.    Individual or family insurance or subscriber contracts;
2    Individual or family coverage through Health Maintenance Organizations (HMOs);
3.    Individual or family coverage under other prepayment, group practice and individual practice plans;
4.    School accident-type coverages. (These contracts cover students for accidents only, including athletic injuries, either on a twenty-four hour basis or on a to-and-from school basis);
5.    Group or group-type hospital indemnity benefits of $100 per day or less;
6.    Medicare Supplement policies;
7.    A state plan under Medicaid.

 **"Primary Plan (Primary)"** – means the Plan which determines its benefits before those of the other Plan. When there are more than two (2) Plans, This Plan may be Primary as to one and Secondary as to another.

**"Secondary Plan (Secondary)"** – means the Plan which determines its benefits after those of the other Plan. When there are more than 2 Plans, This Plan may be Secondary as to one and Primary as to another.

**"This Plan"** – means the benefits provided under this group policy.

**Effect on Benefits.** Plans use COB to decide which plan should pay first for a covered expense. If the Primary Plan's payment is less than the charge for the allowable expense, then the Secondary Plan will apply its benefit payment to the balance.

The following rules will be used to establish the order of benefit determination:

1. A plan which does not have a COB provision will always be the Primary Plan.
2. The benefits of a plan which covers the person on whose expenses the claim is based as other than a dependent will be determined before the benefits of a plan which covers the person as a dependent. However, if the person is also a Medicare beneficiary, and if the rule established under the Social Security Act of 1965, as amended, makes Medicare secondary to the plan covering the person as a dependent of an active employee, the order of benefit determination is:
   A. First, benefits of a plan covering persons as an employee, member, or subscriber.
   B. Second, benefits of a plan of an active worker covering persons as a dependent.
   C. Third, Medicare benefits.
3. The benefits of a plan that covers a person for whom a claim is made as a dependent child will be determined under the following rules:
   A. When the parents are married: the benefits of a plan which covers the child as a dependent of the parent whose birthday anniversary occurs earlier in the calendar year will be determined before the benefits of a plan which covers the child as a dependent of the parent whose birthday anniversary occurs later in the calendar year.
   B. If both parents have the same birthday the benefits of the plan that covered the parent longer are determined before those of the plan that covered the other parent for a shorter period of time.
   C. If the plans do not agree on the order of benefit rules because the other plan does not have the rule described in this section, but has a rule based upon the gender of the parent, the rule in the other plan will determine the order of benefits.
   D. When the parents are separated or divorced and the parent with custody has not remarried the benefits of a plan which covers the child as a dependent of the parent with custody of the child will be determined before the benefits of a plan which covers the child as a dependent of the parent without custody.
   E. When the parents are divorced and the parent who has custody of the child has remarried: (a) the benefits of a plan which covers the child as a dependent of the parent with custody will be determined before the benefits of a plan which covers the child as a dependent of the step-parent; and (b) the benefits of a plan that covers the child as a dependent of the step-parent will be determined before the benefits of a plan that covers the child as a dependent of the parent without custody.
   F. Despite (2) and (3) above, if there is a court decree which would otherwise establish financial responsibility for the medical, dental or other health care expenses with respect to the child, the benefit payment of a plan which covers the child as a dependent of the parent with such financial responsibility will be determined before the benefit payment of any other plan that covers the child as a dependent child.
4. The benefits of a plan that covers a person as a primary insured who is neither laid off nor retired, or as that primary insured's dependent, are determined before those of a plan that covers that person as a laid off or retired primary insured or as that primary

insured's dependent. This rule will not apply if the other plan does not have this rule and if, as a result, the plans do not agree on the order of benefits.

5.   If a person whose coverage is provided under a right of continuation pursuant to federal or state law is covered under another plan, the following will be the order of benefit determination:

A.   First, the benefits of a plan covering the person as an employee, member, or subscriber (or as that person's dependent);

B.   Second, the benefits under the continuation coverage. If the other plan does not have the rule described above and if, as a result, the plans do not agree on the order of benefits, this rule is ignored.

6   When rules 2 through 5 do not establish an order of benefit determination the benefits of a plan which has covered the person on whose expenses the claim is based for the longer period of time will be determined before the benefits of a plan which has covered the person the shorter period of time.

**Facility of Payment.** If another plan makes a benefit payment that should have been made by us we have the right to pay the other plan any amount we deem necessary to satisfy our obligation under these COB rules.

**Right of Recovery.** If the amount of our benefit payment is more than the amount needed to satisfy our obligation under these COB rules, we have the right to recover the excess amount from: (A) any persons to or for whom, or with respect to whom, the payments were made; (B) any insurance companies; or (C) any other organizations.

**Right to Receive and Release Necessary Information.** In order to carry out these COB rules:

1.   We have the right, without the consent of or notice to any person, to exchange information with any person, insurance company or organization, as we deem necessary; and

2.   Any person claiming benefits under this plan must give us any information necessary to carry out this provision.

## PART VIII - CLAIM PROVISIONS

Notice of Claim: Written notice of claim must be given within 31 days after a covered loss begins or as soon as is reasonably possible. The notice must be given to the Company named on the Schedule of Benefits. Notice should include information that identifies the claimant and the policy.

Claim Forms: When the Company receives notice of claim, forms for filing proof of loss will be sent to the claimant. If claim forms are not supplied within 15 days, a claimant can give proof as follows:
1.    In writing;
2.    Setting forth the nature and extent of the loss; and
3.    Within the time stated in the Proof of Loss provision.

Proof of Loss: Written proof of loss must be given to the Company within 90 days after the loss begins. We will not deny nor reduce any claim if it was not reasonably possible to give proof of loss in the time required. In any event, proof must be given to the Company within one year after it is due unless the Insured is legally incapable of doing so.

Time of Payment of Claim: Benefits for loss covered by the policy will be paid as soon as we receive proper written proof of such loss, but no later than 30 working days after We receive Proof of Loss.

Payment of Claims: All benefits will be paid to the Insured, if living, unless an Assignment of Benefits has been requested by the Insured. Any other benefits due and unpaid at the Insured's death will be paid to the Insured's estate. If a benefit is to be paid to the Insured's estate, or to an Insured or beneficiary who is not competent to give a valid release, the Company may pay up to $1,000.00 of such benefit to one of the Insured's relatives who is deemed by the Company to be justly entitled to it. Such payment, made in good faith, fully discharges the Company to the extent of the payment.

Physical Examination: At our expense, we may have a person claiming benefits examined as often as reasonably necessary while the claim is pending.

Legal Action: No legal action may be brought to recover on the policy before 60 days after written proof of loss has been furnished as required by the policy. No such action may be brought after three years from the time written proof of loss is required to be furnished.

Third Party Liability: No benefits are payable for any Sickness, Injury, or other condition for which a third party may be liable or legally responsible by reason of negligence, an intentional act, or breach of any legal obligation on the part of such third party. Nevertheless, the Company will advance the benefits of this policy to the Insured subject to the following:
1.      The Insured agrees to advise Us, in writing, within 60 days of any Covered Person's claim against the third party and to take such action, provide such information and assistance, and execute such paper as We may require to facilitate enforcement of the claim. The Insured and Covered Person also agree to take no action that may prejudice Our rights or interests under this policy. Failure to provide notice of a claim or to cooperate with Us, or actions that prejudice Our rights or interests, will be material breach of this policy and will result in the Insured being personally responsible for reimbursing Us.

2      We will automatically have a lien, to the extent of benefits advanced, upon any recovery that any Covered Person receives from the third party, the third party's insurer, or the third party's guarantor. Recovery may be by settlement, judgment or otherwise. The lien will be in the amount of benefits paid by Us under this policy for the treatment of the Sickness, disease, Injury or condition for which the third party is liable.

Independent Medical Review: A Covered Person, or a representative acting on his or her behalf, has the right to request an independent medical review whenever healthcare services have been denied, modified or delayed by Us, if the decision was based in whole or in part on a finding that the proposed health care services are not medically necessary. A doctor, or other health care provider, may assist in seeking an independent medical review and may advocate on such Covered Person's behalf.

## PART IX – GENERAL PROVISIONS

<u>Time Limit on Certain Defenses:</u> The validity of coverage issued under the Policy with respect to an Insured or his Eligible Dependents may not be contested after three years from each certificate's effective date, except for nonpayment of premiums.

<u>Misstatement of Age:</u> If the age of any Covered Person is incorrectly stated, we will make a fair adjustment of the premiums, benefits or both. The adjustment will be based on the premiums and benefits that would have been payable had we known the correct information.

<u>Not in Lieu of Workers' Compensation:</u> The policy is not in lieu of and does not affect requirements for coverage under Workers' Compensation laws.

<u>Pronouns:</u> Whenever a personal pronoun in the masculine gender is used, it will be deemed to include the feminine also, unless the context clearly indicates to the contrary.

## PART X – SCHEDULE OF BENEFITS

**INSURED INFORMATION**:

Name: Linda Conroy

Policy Effective Date: 08-01-2014

**COVERAGE PERIOD**: 6 Months

**ELIGIBILE DEPENDENTS COVERED**

**COVERAGE AND BENEFIT AMOUNTS**:

| | |
|---|---|
| Deductible | 7500 per Covered Person per Coverage Period. Maximum of 3 Deductibles per family per Coverage Period.<br><br>An additional Deductible of $250 per visit will be applied to charges for use of emergency room in the event of Sickness unless the Covered Person is directly admitted as an Inpatient for further treatment. |
| Coinsurance | During a Coverage Period, the Company will pay 80% of the next $5,000 of Eligible Expenses after the Deductible, then 100% of Eligible Expenses to the Overall Maximum Limit. |
| Urgent Care Center | For each visit, the Covered Person shall be responsible for a $50 co-payment, after which Coinsurance will apply. Not subject to Deductible |
| Hospital Room and Board | Average Semi-private room rate, including nursing services. |
| Local Ambulance | Injury: Usual and Customary charges to a Maximum of $250 per trip, when related to a covered Injury.<br>Sickness: Usual and Customary charges to a maximum of $250 per trip, when covered Sickness results in hospitalization as Inpatient |
| Intensive Care Unit | Usual and Customary charges |
| Physical Therapy | $50 Maximum per visit per day |
| Home Health Care | Maximum 1 visit per day. Maximum of 40 visits during a Coverage Period |
| Extended Care Facility | Not to exceed a daily rate of $150 nor a maximum of 60 days |

| All Other Eligible Medical Expenses | Usual and Customary charges |
|---|---|
| Penalty for Failure to Pre-certify | 50% of Eligible Medical Expenses |
| Overall Maximum Limit per Coverage Period | $2,000,000 |