UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HCC LIFE INSURANCE COMPANY, an Indiana corporation,<br><br>Plaintiff,<br><br>v.<br><br>KEVIN CONROY and LINDA CONROY,<br><br>Defendants.<br><br>AND RELATED COUNTERCLAIMS | Case No.: 3:15-cv-02897-BEN-BLM<br><br>**ORDER DENYING MOTION FOR SUMMARY JUDGMENT** |

Now before the Court is Plaintiff HCC Life Insurance Company's ("Plaintiff" or "HCC Life") Motion for Summary Judgment. (ECF No. 30.) HCC Life seeks to rescind a short-term health insurance policy it issued to Defendants Linda Conroy and Kevin Conroy. Defendants oppose the motion. (ECF No. 45.) Because genuine issues of material fact exist, the Court **DENIES** the motion.

/ / /

/ / /

/ / /

# BACKGROUND[1]

HCC Life argues that the Conroys misrepresented and concealed facts about Kevin Conroy's alcohol abuse and degenerative disc disease that the Conroys were required to disclose when they applied for health insurance. Had it known these facts, HCC Life contends that it would not have issued the policy. Later, after learning about Mr. Conroy's medical history, HCC Life rescinded the Conroys' policy. The relevant facts related to Mr. Conroy's medical history, Mrs. Conroy's application for the HCC Life policy, and HCC Life's subsequent rescission are discussed below.

### 1. Kevin Conroy's Medical History

On June 15, 2012, Kevin Conroy visited Dr. Steven Green at Sharp Medical Group, reporting right shoulder and neck pain for the past 18 months. (Padgett Decl. Ex. G-57.) Mr. Conroy asked to have the shoulder and neck pain evaluated as a workers' compensation injury. (*Id.*) He also told the doctor that, "for many years," he has consumed "12-15 beers a day" and that he "knows [he should] cut down." (*Id.*) Dr. Green diagnosed Mr. Conroy with a "neck strain (847.0)," which he suspected was arthritis and referred the injury for worker's compensation evaluation. (*Id.* Ex. G-58.) He also diagnosed Mr. Conroy with "alcohol abuse (305.00)" and advised him to reduce his alcoholic intake. (*Id.*)

Mr. Conroy had another visit with Dr. Green on August 8, 2012. He again reported chronic right shoulder and neck pain, but had reduced his alcoholic intake to six beers a day. (*Id.* Ex. G-59.) Dr. Green assessed Mr. Conroy with "neck pain (723.1)" believed to be arthritis, "shoulder joint pain (719.41)" related to a "significant rotator cuff impingement," and "alcohol abuse (305.00)." (*Id.* Ex. G-60.) During another visit on

---

[1] The Court's reference to certain pieces of evidence is not an indication that this is the only pertinent evidence relied on by the Court or considered. The Court has reviewed and considered all the evidence submitted by the parties. To the extent not otherwise stated and not inconsistent with this Order, the parties' evidentiary objections are overruled. The Court also grants HCC Life's request for judicial notice.

May 17, 2013, Mr. Conroy reported that he had "cut his alcohol down to about 2 beers per day," but Dr. Green noted that Mr. Conroy had a "[h]istory of elevated ALT thought to be from alcohol."[2] (*Id.* Ex. G-62-63.)  This time, Dr. Green did not list "alcohol abuse (305.00)" in the diagnosis section of the report. (*Id.* Ex. G-63.)

On August 13, 2013, Dr. Paul Murphy evaluated Mr. Conroy for his reported worker's compensation injury to his neck and shoulders. (*Id.* Ex. G-65.)  The report notes that, in June 2013, Mr. Conroy had surgery for the rotator cuff tear. (*Id.* Ex. G-66.)  The report also indicates that Mr. Conroy consumes 12 to 15 beers a week and summarizes his earlier medical records. (*Id.* Ex. G-67.)  The summary notes that on October 31, 2012, Mr. Conroy had an initial orthopedic consultation and X-rays "exposed to the cervical spine [*i.e.*, his neck] revealed severe degenerative changes and arthritis."[3] (*Id.* Ex. G-80.)  Mr. Conroy's diagnosis at that October 2012 visit included "[m]yoligamentous cervical spine sprain/strain." (*Id.*)

During the August 2013 evaluation, Dr. Murphy took X-rays of Mr. Conroy's right and left shoulders and cervical spine. (*Id.* Ex. G-71.)  X-rays of the cervical spine "reveal[ed] normal overall bony alignment, no fracture or dislocation.  There is disc space narrowing at C3-4, C4-5, C5-6, and C6-7." (*Id.*)  In response to these X-rays, Dr. Murphy states an "impression" of "degenerative disc disease, multiple levels, cervical spine." (*Id.*)  Later, in the conclusions section of the report, Dr. Murphy diagnoses Mr. Conroy with "[m]usculoligamentous sprain/strain, cervical spine," "[m]usculoligamentous sprain/strain" to both shoulders, and rotator cuff repair. (*Id.* Ex. G-89-90.)  Dr. Murphy opined that Mr. Conroy had no use of his right upper extremity, required physical therapy, and should undergo an MRI study of his cervical spine and left

---

[2] "ALT" is an abbreviation for alanine aminotransferase. Stedman's Medical Dictionary 24970 (Westlaw 2014).

[3] The cervical spine is the neck. *See* Stephen G. Brown, M.D. & Steven Plitt, The Claim Adjuster's Automobile Liability Handbook, § 11.13 Spine—Cervical spine (neck) (2016).

shoulder. (*Id.* Ex. G-90.) He further opined that Mr. Conroy's injuries were work-related. (*Id.* Ex. G-91.) Mr. Conroy was carbon copied on the report. (*Id.* Ex. G-92.)

Dr. Murphy re-evaluated Mr. Conroy in February 2014. The report notes that Mr. Conroy "drinks beers" but does not state a quantity. (*Id.* Ex. G-94.) X-rays were again taken of the cervical spine and shoulders. The cervical spine X-rays "reveal[ed] normal overall bony alignment, no fracture or dislocation. There is mild loss of cervical lordosis. Mild disc space narrowing at C3-4, C4-5, and C5-6. There is mild anterolisthesis of C4 and C5 measuring 1mm." (*Id.* Ex. G-99.) The "impression" from these X-rays was "[l]oss of cervical lordosis and degenerative disc disease, multilevel cervical spine." (*Id.*)

The report also summarizes the results of the cervical spine and left shoulder MRI study from December 2013. The MRI found "moderate broad-based disc herniation" and "mild uncovertebral joint degenerative joint disease" to certain vertebrae. (*Id.* Ex. G-102-103.)

Dr. Murphy's conclusions again included a diagnosis of "[m]usculoligamentous sprain/strain, cervical spine" and "[m]usculoligamentous sprain/strain" of both shoulders. (*Id.* Ex. G-104.) Dr. Murphy characterized "Mr. Conroy's pain referable to his neck as being intermittent and slight in nature." (*Id.* Ex. G-105.) Related to the cervical spine, Dr. Murphy opined that Mr. Conroy had suffered a 25% loss of preinjury capacity for lifting and a "5% impairment of the whole person." (*Id.* Ex. G-106.) Mr. Conroy was again copied on the report. (*Id.* Ex. G-110.)

Dr. Murphy issued a supplemental report on May 16, 2014 in response to a request for additional information. He repeated that the August 2013 "cervical spine X-rays revealed degenerative disc disease at multiple levels of the cervical spine" and that the February 2014 X-rays "of the cervical spine reveal[ed] loss of cervical lordosis and degenerative disc disease, multilevel." (*Id.* Ex. G-122-123.) Dr. Murphy reaffirmed his conclusions about Mr. Conroy's work-related injuries of sprains/strains to the cervical spine and shoulders. (*Id.* Ex. G-123-124.) Mr. Conroy was copied on the supplemental report. (*Id.* Ex. G-127.)

**2. Linda Conroy Applies for HCC Life Health Insurance**

In July 2014, Linda Conroy submitted an application to HCC Life for a short term health insurance policy for herself and Mr. Conroy. (Decl. of Linda Conroy ¶ 6.)  Mr. Conroy did not participate in the enrollment process. (*Id.*, Decl. of Kevin Conroy ¶ 8.) Per HCC Life's usual process, Mrs. Conroy completed the enrollment process over the phone. (L. Conroy Decl. ¶ 6; Defs.' Notice of Lodgment ("NOL"), Ex. A, Excerpted Tr. of Dep. of Jon Padgett ("Padgett Dep.") at 50:19-23.)  During the phone call, Mrs. Conroy was asked Question 3 on the application forms, which inquired:

> 3. Within the last 5 years, have you been *diagnosed, treated, or taken medication* for any of the following:  cancer or tumor, stroke, heart disease, including heart attack, chest pain or heart surgery, COPD (chronic obstructive pulmonary disease) or emphysema, Crohn's disease, liver disorder, *degenerative disc disease or herniation/bulge*, rheumatoid arthritis, kidney disorder, diabetes, degenerative joint disease of the knee, *alcohol abuse* or chemical dependency, or any neurological disorder?

(Padgett Decl. Ex. A, Enrollment Form, & Ex. B, Dependent Medical Questionnaire (emphasis added)). Mrs. Conroy answered "no" for both herself and Mr. Conroy, and the HCC Life agent placed her answer on the forms. (*Id.*; Padgett Dep. at 51:2-6.)  The forms include an "authorization" section that provides, in part:

> I understand this insurance contains a Pre-existing Condition exclusion, a Pre-certification Penalty and other restrictions and exclusions.  I agree that coverage will not become effective for me or any dependent whose medical status, prior to the effective date, has changed and therefore results in a "yes" answer to any of the medical questions on this application.  If my medical status changes in any way, coverage will be declined for all individuals included on this application.

(*Id.*)  Following this section, the application forms bear the electronic signatures of Mr. and Mrs. Conroy. (*Id.*)

Mrs. Conroy reaffirmed these representations in a verification phone call. (*Id.* Ex. C, Tr. of Recording.)  She confirmed that she answered the questions for all family members applying for coverage and again responded "no" to question 3. (*Id.*)  She paid

for the Conroys' first month of coverage at that time, and HCC Life issued a policy effective August 1, 2014. (*Id.*)

Mrs. Conroy declares that she answered all of the enrollment questions over the phone to the best of her ability. (L. Conroy Decl. ¶ 7.) She does not recall reviewing any paperwork associated with her enrollment. (*Id.* ¶ 13.) She states that, to the best of her recollection and knowledge, from 2009 to 2014, Mr. Conroy had not been diagnosed, treated, or taken medication for or experienced signs or symptoms of degenerative disc disease or herniation/bulge or alcohol abuse. (*Id.* ¶ 8-10.)

Mr. Conroy repeats this assertion in his declaration. (K. Conroy Decl. ¶ 11.) He states that, prior to the application with HCC Life, he does not recall any discussions with his medical providers wherein he was informed that he had been diagnosed with alcohol abuse or a degenerative disc disease or herniation/bulge. (*Id.* ¶¶ 12-13.) As to his alcohol consumption, he declares that he remembers conversations with his primary care physician advising him to reduce his alcoholic intake, but he was never informed by anyone that he needed alcohol abuse treatment, and he has never been referred to a treatment or counseling center for alcohol abuse. (*Id.* ¶ 12.) With respect to degenerative disc disease or herniation/bulge, he states that he understood that he suffered from a cervical sprain or strain. (*Id.* ¶ 13.) He attests that it was and is his understanding that the treatment he received for his shoulder and related neck pain was to treat his torn rotator cuff and cervical strain or sprain, not to treat any degenerative disc disease or herniation/bulge. (*Id.*) He does not believe he has ever been prescribed medication for a degenerative disc disease or herniation/bulge. (*Id.*)

**3. Kevin Conroy's Hospital Stay**

On September 16, 2014, Kevin Conroy was admitted to Sharp Memorial Hospital with chest pains. (Padgett Decl. Ex. G-45.) His admission chart states that he has a history of "heavy alcohol use" and "cervical degenerative joint disease," also known as "cervical DJD." (*Id.* Ex. G-45, G-48.) Mr. Conroy reported that he "drinks 3 to 4 beers a

day for the past 43 years" and that he "knows he should quit." (*Id.* Ex. G-46.) He also stated that "he has 4 herniated disk [sic] in his neck with chronic neck pain." (*Id.*)

The next day, social worker Carol Pederson visited the Conroys in the hospital "due to pt's ETOH abuse."[4] (*Id.* Ex. G-56.) Ms. Pederson noted that Mr. Conroy "became agitated today (most likely due to ETOH withdrawal)." (*Id.*) While Mr. Conroy was sedated, Ms. Pederson spoke to Mrs. Conroy. The report notes the following:

> Wife feels [Mr. Conroy] "self medicates" his pain with ETOH and smoking marijuana. Pt's wife said that her husband really drinks 12-14 beers per day over the last 40+ years. . . . [I]t is a family concern that the pt be sober for the benefit of his family members (in addition to his own health). . . . [S]he has given up trying to convince pt to stop drinking, instead focusing on "a more healthful way of living."

(*Id.*) Ms. Pederson suggested that the family "would benefit from further education about dynamics of substance abuse, as they have never been involved in any treatment, counseling, Al-Anon, etc." (*Id.*) The report concludes that "Pt's wife is cautiously hopeful, but son seems dubious anything will lead his father to stop drinking." (*Id.*)

Mr. Conroy was discharged on or about October 18, 2014. (*Id.* Ex. G-52.) His discharge report states under "discharge diagnoses" that Mr. Conroy has a "[h]istory of chronic alcohol abuse" and "[h]istory of resolved delirium tremors." (*Id.*) The report states that doctors thought he suffered from alcohol withdrawal while in the hospital and treated him accordingly. (*Id.* Ex. G-53.) To treat his heart issues, Mr. Conroy underwent a "cardiac catheterization with coronary angiography." (*Id.*) The report also notes that Mr. Conroy was "chronically malnourished," "develop[ed] hospital-acquired pneumonia," and had a leg infection. (*Id.*)

/ / /

---

[4] "ETOH" is an abbreviation for ethyl alcohol and is a synonym for alcohol. Stedman's Medical Dictionary 305960 (Westlaw 2014).

### 4. HCC Life Rescinds the Conroys' Policy

The Conroys submitted a claim for Mr. Conroy's hospital stay. (*Id.* Ex. G.) HCC Life investigated the claim, which included a review of Mr. Conroy's medical records. (*Id.* Ex. H.) Subsequently, on January 30, 2015, HCC Life sent the Conroys a letter rescinding their policy. (*Id.*) The letter explained that, through the claims submission process, HCC Life learned that Mr. Conroy "misrepresented [his] health in response to [question 3] specifically in regards to [his] treatment for alcohol abuse." (*Id.*) The letter stated that if Mr. Conroy had answered the question fully, HCC Life would not have issued coverage.

Mr. Conroy submitted a complaint to the California Department of Insurance. (*Id.* Ex. I.) The Commissioner refused to order reinstatement of the Conroys' policy. (*Id.* Ex. J.) In December 2015, HCC Life filed its complaint in federal court for rescission, intentional misrepresentation, declaratory judgment, and equitable indemnity. HCC Life intended the complaint "to serve as further formal notice to Kevin Conroy and Linda Conroy of rescission" of the policy and to provide "notice of their right to request review by the California Insurance Commissioner." (Compl. ¶ 19, ECF No. 1.)

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. However, the inferences that may be drawn are not limitless. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 632 (9th Cir. 1987). Inferences must be based on specific facts and only "rational and reasonable" inferences may be drawn. *Id.*; *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir. 1989).

A moving party bears the initial burden of showing there are no genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co., Inc. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000). "In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *Id.* Once the moving party comes forward with sufficient evidence, the burden then shifts to the non-moving party to show that there is a genuine issue for trial. *See id.* "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. As a general rule, the "mere existence of a scintilla of evidence" will be insufficient to raise a genuine issue of material fact; there must be evidence on which the jury could reasonably find for the non-moving party. *Id.* at 252.

## DISCUSSION

The issue before the Court is whether HCC Life can rescind the Conroys' short-term health insurance policy for failure to disclose Mr. Conroy's alleged alcohol abuse and degenerative disc disease. Under California law,[5] an insurer is entitled to rescind an insurance policy on the ground of an insured's misrepresentation or concealment of material information in his or her application to obtain insurance. *Nieto v. Blue Shield of Cal. Life & Health Ins. Co.*, 181 Cal. App. 4th 60, 75 (2d Dist. 2010). The insurer must satisfy three elements to rescind a policy: (1) the applicant made a misrepresentation; (2)

---

[5] The policy states that it is governed by Missouri law. (Padgett Decl. Ex. D.) However, HCC Life contends that it is unnecessary to apply Missouri law because it does not differ materially from California law. (Mot. at 9.) Defendants do not dispute the application of California law. Therefore, the Court will apply California law.

the misrepresentation was material; and (3) the applicant knew that he or she made a material misrepresentation. *Casey v. Old Line Ins. Co. of Am.*, 996 F. Supp. 939, 944 (N.D. Cal. 1998). Here, summary judgment is inappropriate because genuine disputes of material fact exist at least as to the third element of knowledge.

While a failure to disclose is improper even if there is no intent to deceive, there is no breach of the duty to disclose if the applicant was ignorant of the relevant information, or if he or she, acting in good faith, did not understand the significance of the information he or she failed to disclose. *Miller v. Republic Nat'l Life Ins. Co.*, 789 F.2d 1336, 1339 (9th Cir. 1986); *Thompson v. Occidental Life Ins. Co.*, 513 P.2d 353, 360 (Cal. 1973) (en banc) ("[I]f the applicant for insurance had no present knowledge of the facts sought, or failed to appreciate the significance of information related to him, his incorrect or incomplete responses would not constitute grounds for rescission. Moreover, [q]uestions concerning illness or disease do not relate to minor indispositions but are to be construed as referring to serious ailments which undermine the general health.").

In *Casey*, the Northern District of California found the knowledge element satisfied. 996 F. Supp. at 949. The applicant answered "no" to questions about whether he had received treatment or joined an organization for drug and alcohol abuse, or if he had been advised to discontinue the use of drugs or alcohol. However, contrary to that representation, the applicant had completed a 28-day in-patient treatment stay at a hospital for alcohol and drug abuse and had been ordered to complete ninety Alcoholics Anonymous meetings after the stay. Under such circumstances, the applicant "was aware of the relevant information (his alcoholism and drug abuse and treatment) and its significance." *Id.*

Drawing all justifiable inferences in Defendants' favor, genuine disputes of material fact exist as to whether the Conroys knew Mr. Conroy suffered from alcohol abuse, degenerative disc disease, or herniation/bulge at the time Mrs. Conroy applied for insurance. The Conroys' declarations make this clear: to the best of their knowledge, from 2009 to 2014, Mr. Conroy had not been diagnosed, treated, or taken medication for

or experienced signs or symptoms of degenerative disc disease or herniation/bulge or alcohol abuse. (L. Conroy Decl. ¶ 8; K. Conroy Decl. ¶ 11.) HCC Life argues that the Conroys' declarations are conclusory and self-serving, and therefore do not create a triable issue of material fact. However, "declarations are often self-serving. . . . [T]he district court may not disregard a piece of evidence at the summary judgment stage solely based on its self-serving nature." *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015).

There is no evidence that Mrs. Conroy was aware that her husband had been diagnosed, treated, taken medication for, or exhibited signs of degenerative disc disease, herniation/bulge, or alcohol abuse when she applied for the policy. At most, she expressed concern about his drinking to the hospital social worker, but there is a genuine dispute whether she believed his drinking to be abuse. The district court must not make credibility determinations when ruling on a motion for summary judgment. Moreover, the social worker's report admits that the Conroy family had never been involved in any treatment or counseling for substance abuse.

There are also genuine issues whether Mr. Conroy was aware he suffered from degenerative disc disease, herniation/bulge, or alcohol abuse. In Dr. Murphy's reports, the cervical spine X-rays state an "impression" of "degenerative disc disease." However, the conclusion sections of the reports do not repeat that alleged diagnosis. Rather, the reports state that Mr. Conroy was diagnosed with sprains and strains of the cervical spine and shoulders, and a rotator cuff tear. Mr. Conroy was copied on the reports, but he declares that he was never informed about a degenerative disc disease diagnosis. Instead, he understood that he suffered from a cervical sprain or strain—an understanding consistent with the diagnoses listed in the conclusion sections of the reports. A lay person is not held to the level of knowledge or understanding that a doctor or other expert might have. *Miller*, 789 F.2d at 1340.

Similarly, Mr. Conroy declares that he was never informed of an alcohol abuse diagnosis, and that he never received treatment for alcohol abuse. There is no evidence

that Dr. Green shared his assessment that Mr. Conroy suffered from "alcohol abuse (305.00)" with Mr. Conroy.  Mr. Conroy recalls being advised to reduce his alcoholic intake, but was never referred to abuse treatment or counseling.  The facts here are thus different than those in *Casey*.

Genuine disputes of material fact exist as to the Conroys' knowledge of Mr. Conroy's ailments.  Accordingly, HCC Life's motion for summary judgment is **DENIED**.

**IT IS SO ORDERED.**

Dated:  March 22, 2017

Hon. Roger T. Benitez
United States District Judge