SEDGWICK LLP
DENNIS G. ROLSTAD, State Bar No. 150006
*dennis.rolstad@sedgwicklaw.com*
ELIZABETH A. TRITTIPO State Bar No. 215622
*elizabeth.trittipo@sedgwicklaw.com*
333 Bush Street, 30th Floor
San Francisco, CA 94104-2834
Telephone: 415.781.7900
Facsimile: 415.781.2635

Attorneys for Plaintiff
HCC LIFE INSURANCE COMPANY

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HCC LIFE INSURANCE COMPANY, an Indiana corporation,<br><br>       Plaintiff,<br><br>       v.<br><br>KEVIN CONROY, LINDA CONROY,<br><br>       Defendants.<br><br>KEVIN CONROY, LINDA CONROY<br><br>       Counter-Claimants,<br><br>       v.<br><br>HCC LIFE INSURANCE COMPANY,<br><br>       Counter-Defendant. | Case No. 3:15-CV-02897 BEN BLM<br><br>**APPLICATION FOR RECONSIDERATION OF RULING ON HCC LIFE INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT**<br><br>**Fed. R. Civ. Proc. 60(b)**<br>**CivLR 7.1(i)** |

84494521v2

Case No. 3:15-CV-02897 BEN BLM

HCC LIFE'S APPLICATION FOR RECONSIDERATION

# **TABLE OF CONTENTS**

**Page**

I.  Introduction ............................................................................................... 1

II.  Factual Background ..................................................................................... 2

   A.   On August 26, 2016, HCC Life Moved for Summary Judgment ........... 2

   B.   Defendants Submit Mr. Conroy's Declaration In Opposition to the Motion for Summary Judgment ........................................................ 3

   C.   In Early March, HCC Life Obtained New Evidence that Supports its Summary Judgment Motion ............................................................... 4

   D.   On March 22, 2017, the Court Denied HCC Life's Motion for Summary Judgment .............................................................................. 5

   E.   Newly-Discovered Evidence Shows Mr. Conroy's Knew of his Alcohol Abuse Diagnosis and Treatment ............................................. 6

      1.   Mr. Conroy asked Sharp to Redact Records Showing Alcohol Abuse ................................................................................. 6

      2.   Sharp Redacted Records Showing Mr. Conroy's Alcohol Abuse Diagnosis in Response to His Request ........................... 7

      3.   Medical Records Show Harm Reduction Treatment Going Back to 1992 ................................................................................. 7

      4.   Deposition Testimony Based On These Records Show Mr. Conroy Knew About his Alcohol Abuse Diagnosis and Treatment ................................................................................. 9

         (a)   Testimony by Dr. Green ................................................. 9

         (b)   Dr. Zucker's Testimony ............................................... 11

         (c)   Mr. Conroy's Testimony .............................................. 12

         (d)   Mrs. Conroy's Testimony ............................................ 13

   F.   Newly-Discovered Evidence Shows Mr. Conroy Knew About his Degenerative Disc Disease Diagnosis and Treatment ......................... 13

      1.   Mr. Conroy's Employer Discussed Dr. Murphy's February 2014 Report with Mr. Conroy ..................................... 13

      2.   Medical Records Show Mr. Conroy was Treated for and Diagnosed with Degenerative Disc Disease ............................... 14

      3.   Dr. Murphy Testified that Mr. Conroy was Diagnosed, Treated, and Informed of His Degenerative Disc Disease ......... 14

4.   Mr. Conroy Testified that he Received at Least Two of Dr. Murphy's Reports ................................................................. 15

5.   Dr. Lewis Testified that Mr. Conroy was Diagnosed and Treated for Degenerative Disc Disease and Herniation, and Knew his Diagnosis ............................................................ 16

6.   Dr. Zucker's Testimony ............................................................ 17

III.   Argument ................................................................................................ 17

A.   Newly-Discovered Evidence Demonstrates Reconsideration is Appropriate in this Case ................................................................. 18

B.   Newly-Discovered Evidence Shows Mr. Conroy Knew He Had Been Treated For and Diagnosed With Alcohol Abuse ..................... 19

1.   HCC Life Does not Need to Prove Mr. Conroy was Informed he was Diagnosed with "Alcohol Abuse" ................. 20

2.   Mr. Conroy's Declaration is Insufficient to Create a Triable Issue of Fact Because it is Internally Inconsistent and Lacks Supporting Evidence ............................................... 22

(a)   Mr. Conroy's Declaration is Internally Inconsistent ........ 22

(b)   Mr. Conroy's Declaration Lacks Corroborating Evidence ......................................................................... 23

C.   Newly-Discovered Evidence Shows Mr. Conroy Knew He Had Been Treated for and Diagnosed With DJD ................................... 24

D.   There is No Evidence to Support Defendants' Bad Faith Claim .......... 24

IV.   Conclusion ............................................................................................. 25

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page</u>

**Cases**

3

*Alpern v. UtiliCorp United, Inc.*
4
    84 F.3d 1525 (8th Cir. 1996) ...................................................................... 18

5

*Bosetti v. U.S. Life Ins. Co. in City of N.Y.*
6
    175 Cal. App. 4th 1208 (2009) ................................................................... 24

7

*Brandwein v. Butler*
8
    218 Cal. App. 4th 1485 (2013) ................................................................... 24

9

*F.T.C. v. Publ'g Clearing House, Inc.*
10
    104 F.3d 1168 (9th Cir.1997) ........................................................... 22, 23, 24

11

*Keshish v. Allstate Ins. Co.*
12
    959 F. Supp. 2d 1226 (C.D. Cal. 2013) ..................................................... 25

13

*Nieto v. Blue Shield of California Life & Health Ins. Co.*
14
    181 Cal. App. 4th 60 (2010) ................................................................ 20, 24

15

*Nigro v. Sears, Roebuck & Co.*
    784 F.3d 495 (9th Cir. Cal. 2015) ............................................................. 22

16

*Philp v. Jackson Nat. Life Ins. Co.*
17
    107 F.3d 878 (9th Cir. 1997) ..................................................................... 21

18

*Salkin v. USAA Life Ins. Co.*
19
    544 F. App'x 713 (9th Cir. 2013) ............................................................. 20

20

*SEC v. Phan*
21
    500 F.3d 895 (9th Cir. 2007) ..................................................................... 23

22

*Tran v. Kansas City Life Ins. Co.*
    No. 2:15-cv-09963-ODW (RAOx), 2017 WL 58826, 2017 U.S. Dist. LEXIS
23
    1697, (C.D. Cal. Jan. 5, 2017), 2017 WL 380901, 2017 U.S. Dist. LEXIS 15800
24
    (C.D. Cal. Jan. 25, 2017) .................................................................. 20, 23, 24

25

*Wanderer v. Johnston*
26
    910 F.2d 652 (9th Cir. 1990) ....................................................................... 7

27

28

**Rules**

Federal Rules of Civil Procedure

    Rule 37................................................................................................................7

    Rule 60(b)........................................................................................................18

    Rule 60(b)(1)...................................................................................................18

    Rule 60(b)(2)...................................................................................................18

    Rule 60(c)(1)...................................................................................................18

1  I.  **Introduction**

2  Newly discovered evidence shows that defendants Linda and Kevin Conroy

3  ("defendants") knew that Kevin Conroy was diagnosed and treated for alcohol

4  abuse, and was also diagnosed and treated for degenerative disc disease and

5  herniation ("DJD"), and for that reason summary judgment in HCC Life's favor

6  should be granted.  Defendants incorrectly asserted that Kevin Conroy had not been

7  so diagnosed or treated when they applied for the policy.  HCC Life need only show

8  misrepresentation as to either alcohol abuse or DJD in order to rescind.  Documents

9  belatedly produced in this action, and deposition testimony, show that defendants'

10  declarations are insufficient to create a genuine issue of material fact and HCC Life

11  Insurance Company ("HCC Life") is entitled to judgment in its favor.  At a

12  minimum, this newly-produced evidence demonstrates that HCC Life did not act in

13  bad faith in denying coverage for Mr. Conroy's claim.

14  Mr. Conroy's uncorroborated declaration is contradicted by his medical

15  records and the testimony of his treating physician, and is therefore insufficient to

16  create a triable issue of material fact.  Recently produced documents include a letter

17  Mr. Conroy sent to his medical providers expressly instructing them to conceal

18  references to alcohol in his medical records.  In accordance with his instructions,

19  those providers produced documents that were indeed "blacked out."  Mr. Conroy

20  committed fraud when he tried to conceal his private health information and medical

21  history from his insurer.  The documents also show that Mr. Conroy had repeatedly

22  been diagnosed with and treated for alcohol abuse using a harm-reduction approach

23  for more than twenty years before applying for insurance with HCC Life.  Mr.

24  Conroy's doctor, Dr. Green, testified based in part on these newly-produced

25  documents that he repeatedly told Mr. Conroy that his drinking was excessive, and

26  that he needed to cut back.  Dr. Green testified that telling a patient to cut back is a

27  form of treatment.  It is undisputed that Mr. Conroy responded to Dr. Green's

28  instructions by making repeated efforts to cut back.  HCC Life's expert, Dr. Zucker,

Sedgwick LLP

testified that Mr. Conroy was aware that he had a diagnosis of alcoholism and that he received treatment for it.

Mr. Conroy's declaration concerning his DJD is also uncorroborated and is therefore insufficient to create a triable issue of material fact.  Documents produced on March 6, 2017 do not corroborate Mr. Conroy's declaration, but instead show that Mr. Conroy knew about his diagnosis and treatment for DJD.  A letter from Mr. Conroy's employer indicates that the employer discussed Dr. Murphy's QME report with Mr. Conroy.  That report described and addressed Mr. Conroy's DJD, and Mr. Conroy admitted in his deposition that he received at least two of these reports. Newly-obtained records and deposition testimony based on those records demonstrate that Mr. Conroy knew he had experienced symptoms of DJD, was diagnosed with DJD, and received physical therapy to treat this disorder before he applied for insurance with HCC Life.  HCC Life's expert testified that, given the applicable standard of care and the many doctors' visits addressing this condition, Mr. Conroy knew that he suffered from DJD.

HCC Life therefore seeks reconsideration of the Court's March 22, 2017 order denying HCC Life's motion for summary judgment on the basis of newly-discovered evidence that supports the motion.  HCC Life also seeks a finding that it did not breach the covenant of good faith.  At a minimum it made a reasonable decision to deny coverage.

## II.   Factual Background

### A.   On August 26, 2016, HCC Life Moved for Summary Judgment

On August 26, 2016, HCC Life moved for summary judgment because defendants intentionally misrepresented material facts in their insurance application. (Memorandum of Points and Authorities in Support of HCC Life's Motion for Summary Judgment ("HCC Life's MSJ"), Docket No. 30-1.)  In response to questions in the policy application and verification call, defendants represented that they had not "within the last five years… been diagnosed, treated or taken

Sedgwick

1    medication for … degenerative disc disease or herniation bulge… [or] alcohol

2    abuse." (HCC Life's MSJ at pp. 1–3.)

3        In its motion, HCC Life introduced evidence that defendants' representation

4    was false.  HCC Life's evidence showed that Mr. Conroy had been diagnosed and

5    treated for alcohol abuse in the few years preceding his application for insurance

6    with HCC Life.  The evidence included hospitalization records reflecting Mr.

7    Conroy's history of chronic alcohol abuse, and Mrs. Conroy's statement to a social

8    worker at the hospital that Mr. Conroy drank 12-14 beers per day over the last 40

9    years, and that it was "a family concern that [Mr. Conroy] be sober for the benefit of

10   his family members (in addition to his own health.)"  HCC Life also introduced Mr.

11   Conroy's medical records that showed Mr. Conroy was repeatedly diagnosed with

12   alcohol abuse before applying for the HCC Life policy certificate.  (HCC Life's

13   MSJ at pp. 4–6.)

14       HCC Life also introduced evidence that Mr. Conroy had been diagnosed and

15   treated for DJD.  The evidence included workers' compensation reports completed

16   by Dr. Paul Murphy that described Mr. Conroy's DJD at multiple levels of the

17   cervical spine.  (HCC Life's MSJ at pp. 6–7.)

18   **B.      Defendants Submit Mr. Conroy's Declaration In Opposition to the**

19   **         Motion for Summary Judgment**

20       In his declaration in opposition to HCC Life's motion for summary judgment,

21   which contained several self-serving statements, Mr. Conroy stated:

22       11.    To the best of my recollection and knowledge, from 2009 to
         2014, I was not diagnosed, treated or taken medication for any of the
23       following: heart disease including heart attack, chest pain or had heart
         surgery, degenerative disc disease or herniation/bulge, or alcohol abuse.

24
         12.    Prior to the application for insurance with HCC Life Insurance
25       Company, I do not recall any discussions with any medical providers
         wherein I was informed that I had been diagnosed with alcohol abuse.
26       I recall a couple of conversations with my primary care physician
         where in [sic] advised me to "cut back" on my alcohol consumption.  I
27       was never informed by any medical provider, or anyone else, that I
         needed alcohol treatment.  No one has ever referred me to any alcohol
28       abuse treatment or counseling, nor have I ever been prescribed any

Sedgwick LLP

1   medications for alcohol abuse.[1]

2       13.    Prior to the application for insurance with HCC Life Insurance

3   Company, I do not recall any discussions with any medical providers
wherein I was informed that I had been diagnosed with degenerative

4   disc disease or herniation/bulge.  Relating to the neck pain associated
with my shoulder injury, I understood that the treatment I received for

5   my shoulder and related neck pain was to treat the torn rotator cuff and
cervical strain or sprain, not to treat any degenerative disc disease or

6   herniation/bulge.  To the best of my knowledge, I have never been
prescribed medication for degenerative disc disease or herniation/bulge.

7   (Docket No. 45-3 at pp. 2–3.)  Newly-discovered evidence demonstrates that Mr.

8   Conroy's uncorroborated declaration is a misrepresentation to the Court.  That

9   evidence, including Mr. Conroy's own deposition testimony, demonstrates Mr.

10  Conroy's alcohol abuse was diagnosed repeatedly over the course of a 20-year

11  period.  Mr. Conroy's declaration is internally inconsistent because being told to

12  "cut back" is treatment for alcohol abuse.  Because Mr. Conroy's declaration is not

13  only uncorroborated and internally inconsistent, but also directly at odds with

14  documents defendants withheld until March 6, 2017, HCC Life's motion for

15  summary judgment should be granted.

16  **C.    In Early March, HCC Life Obtained New Evidence that Supports**

17  **    its Summary Judgment Motion**

18      After filing its motion for summary judgment, between March 6, 2017 and

19  March 15, 2017, HCC Life obtained evidence that supports the motion that it could

20  not have obtained earlier.

21      On August 10, 2016, HCC Life served defendants with requests for

22  production of documents.  Request number 6 asked defendants to produce all

23  documents in defendants' possession, custody, or control relating to "medical

24  services, including diagnosis OR treatment for any medical condition, provided to

25  Defendant and Counter-Claimant Kevin Conroy from July 25, 2009 to July 25,

26  _____

27  [1] The application asks whether a proposed insured had been "treated" for alcohol

28  abuse, and does not require that the treatment be by a psychologist.

Sedgwick LLP

2014."  Request number 7 asked defendants to produce all documents in defendants' possession, custody, or control relating to any "claim for workers' compensation benefits made by Defendant and Counter-Claimant Kevin Conroy from July 25, 2009 to July 25, 2014, including but not limited to deposition transcripts, medical records, and expert reports."

On March 6, 2017, almost 7 months later, defendants belatedly produced 572 pages of documents.  The documents include medical records and correspondence that directly support HCC Life's motion for summary judgment.

Between March 7, 2017 and March 15, 2017, defendants and HCC Life took the deposition of six witnesses whose testimony further supports HCC Life's motion for summary judgment.  That testimony was based in part on the documents defendants belatedly produced on March 6, 2017.  The testimony could not have been elicited before HCC Life filed its motion for summary judgment because it was based on documents defendants withheld.

**D.     On March 22, 2017, the Court Denied HCC Life's Motion for Summary Judgment**

This Court denied HCC Life's motion for summary judgment on March 22, 2017 only on the ground that a genuine issue of material fact existed as to whether defendants "knew Mr. Conroy suffered from alcohol abuse, degenerative disc disease, or herniation/bulge at the time Mrs. Conroy applied for insurance." (Docket No. 65 at p.10.)  In finding a triable issue of fact with respect to Mr. Conroy's alcohol abuse, the Court noted that defendants in their declarations said they were never informed of an alcohol abuse diagnosis, and Mr. Conroy never received treatment for alcohol abuse.  The Court also found "no evidence that Dr. Green shared his assessment that Mr. Conroy suffered from 'alcohol abuse (305.00).'" (Docket No. 65 at pp. 11–12.) In finding a triable issue of fact as to Mr. Conroy's DJD, the Court noted that defendants' declarations said that, to the best of their knowledge, Mr. Conroy had not been diagnosed, treated, taken medication for,

Sedgwick

1  or exhibited signs or symptoms of DJD.  (Docket No. 65 at pp. 10–11.)  The Court

2  also found genuine issues as to whether Mr. Conroy knew he suffered from DJD.

3  (Docket No. 65 at p. 11.)

4        **E.**    **Newly-Discovered Evidence Shows Mr. Conroy's Knew of his**

5               **Alcohol Abuse Diagnosis and Treatment**

6        Newly-discovered evidence shows that Mr. Conroy knew he had been

7  diagnosed and treated for alcohol abuse, and intentionally misrepresented to HCC

8  Life and to the Court that he had not been so diagnosed and treated.  This evidence

9  demonstrates that HCC Life is entitled to rescission as a matter of law.

10        **1.**    **Mr. Conroy asked Sharp to Redact Records Showing Alcohol**

11               **Abuse**

12        Newly-discovered evidence demonstrates that Mr. Conroy not only knew

13  about his alcohol abuse, but requested that his medical providers conceal that abuse

14  from his employer.

15        On March 6, 2017, defendants produced a July 27, 2012 letter from Mr.

16  Conroy to Sharp Rees-Steely Medical Group.  In the letter Mr. Conroy instructs

17  Sharp that "[a]ny records mentioning alcohol and mental stress must be black [sic]

18  out if the employer request [sic] my records."  (Declaration of Dennis G. Rolstad in

19  Support of Motion for Reconsideration ("Rolstad Decl.") at ¶ 5, Ex. A, CONROY

20  001222.)  This letter demonstrates that Mr. Conroy knew he suffered from alcohol

21  abuse and undertook efforts to conceal it.  Produced documents, received on about

22  September 7, 2016, have indeed been "blacked out," apparently in response to Mr.

23  Conroy's request, to hide evidence of his alcohol abuse.  HCC Life was not

24  provided this letter, and therefore did not know the Sharp documents were blacked

25  out at Mr. Conroy's instruction, until long after the motion for summary judgment

26  was filed and briefing closed, despite having issued a subpoena to Sharp and serving

27  requests for production seven months earlier.  Mr. Conroy committed fraud when he

28  misrepresented his health history on his insurance application and then instructed his

Sedgwick LLP

1  doctors to conceal his alcohol abuse and mental health history.

2  **2.  Sharp Redacted Records Showing Mr. Conroy's Alcohol**
3  **Abuse Diagnosis in Response to His Request**

4  In accordance with Mr. Conroy's instruction, Sharp redacted Mr. Conroy's
5  medical records to conceal his alcohol abuse and mental stress.  (Rolstad Decl. at ¶
6  6, Ex. B (CONROY 000916, 000951, 000953, 000980; [no prefix] 000006, 000008,
7  000010.))

8  On April 7, 2017 at about 2:30 p.m. – the date HCC Life filed this application
9  for reconsideration – defendants produced unredacted copies of some of these
10  documents, far too late for HCC Life to submit them in support of its motion for
11  summary judgment.  The unredacted documents show that Mr. Conroy had been
12  repeatedly diagnosed with alcohol abuse, and that the diagnosis had been redacted.
13  HCC Life had repeatedly requested that Mr. Conroy execute an authorization for the
14  release of unredacted records, but despite repeated requests, he refused to do so.
15  (Rolstad Decl., ¶ 7, Ex. B-1.)

16  The decision to withhold these documents, many until the eve of trial is an
17  evasion of pretrial discovery and is sanctionable conduct. Fed. R. Civ. P. 37;
18  *Wanderer v. Johnston*, 910 F.2d 652, 655 (9th Cir. 1990) (defendants' failure to
19  produce documents and appear for deposition "constitute a clear interference with
20  the plaintiffs' ability to prove the claims and obtain a decision in the case" making
21  prejudice palpable and a default sanction appropriate.)

22  **3.  Medical Records Show Harm Reduction Treatment Going**
23  **Back to 1992**

24  Medical records produced for the first time on March 6, 2017 demonstrate a
25  very long history of alcohol abuse that make it incomprehensible that Mr. Conroy
26  did not know about his diagnosis.  The newly-produced records include reference to
27  a "long talk" Dr. Green had with Mr. Conroy about his alcohol abuse, contradicting
28  the Court's finding of no evidence that Dr. Green conveyed his diagnosis to Mr.

Conroy.  The records show that Mr. Conroy's doctors repeatedly told him to cut down on his drinking beginning in 1992 and continuing through Mr. Conroy's hospitalization.  The records also show that Mr. Conroy's alcohol abuse caused hyperlipidemia, ecchymosis, elevated erythrocyte macrocytic volume ("MCV"), and abnormal liver function test ("LFT") results. These records include:

- An undated history and physical exam form that says Mr. Conroy was told to reduce his alcohol intake ("Etoh… try to ↓") and that health education issues discussed included "etoh" (Rolstad Decl., ¶8, Ex. C at CONROY 001021);

- A March 28, 1995 progress note reflecting a dietician's recommendation that Mr. Conroy reduce his alcohol intake ("3) ↓etoh") because Mr. Conroy "consumes – 600 kcal from etoh daily" (Rolstad Decl., ¶8, Ex. C at CONROY 001011);

- A January 1997 "Allergic/Adverse Reaction" chart showing a January 1997 diagnosis of "alcohol use" and an elevated LFT and MCV secondary to alcohol ("etoh") (Rolstad Decl., ¶8, Ex. C at CONROY 001126);

- A January 31, 1997 progress record reflecting that Dr. Green had a "long talk" with Mr. Conroy concerning his alcohol abuse ("ETOH!!") because Mr. Conroy's test results showed "alcohol related" elevated LFT and MCV (Rolstad Decl., ¶8, Ex. C at CONROY 001009);

- A March 28, 2005 Educational Program Referral Form states that Mr. Conroy was referred to a health education program for hyperlipidemia, a symptom of chronic alcohol abuse (Rolstad Decl., ¶8, Ex. C at CONROY 001213; ¶10);

- April 18, 2007 lab results including Dr. Green's note: "LFTs and trig up.  Etoh.  Please ask patient to work on decreasing alcohol.  We should re check hepatic panel, and triglycerides in three months"

Sedgwick

(Rolstad Decl., ¶8, Ex. C at CONROY 001075);

- An April 23, 2007 phone message record that indicates Dr. Green instructed his assistant to "please ask patient to work on decreasing alcohol," and that his assistant Denise Gomes called Mr. Conroy and told him to cut back ("PT WAS ALSO ADVISED TO DECREASE ALCOHOL.  PT AGREED") (Rolstad Decl., ¶8, Ex. C at CONROY 001127);

- A May 17, 2013 list of active problems including a "history of elevated ALT thought to be from alcohol," as well as ecchymosis and hyperlipidemia which are both associated with alcohol abuse (Rolstad Decl., ¶8, Ex. C at CONROY 000979); and

- A May 17, 2013 visit summary reflecting Mr. Conroy's hyperlipidemia, raised ALT level, and ecchymosis (Rolstad Decl., ¶8, Ex. C at CONROY 000962-963).

The records demonstrate that Mr. Conroy intentionally misrepresented his responses to HCC Life's application for insurance and HCC Life is entitled to rescission as a matter of law.

### 4. Deposition Testimony Based On These Records Show Mr. Conroy Knew About his Alcohol Abuse Diagnosis and Treatment

Shortly after receiving these newly-produced documents, HCC Life took the deposition of several witnesses who testified, based in part on these documents, that Mr. Conroy knew he had been diagnosed with and treated for alcohol abuse.

### (a) Testimony by Dr. Green

Mr. Conroy's primary care physician, Dr. Green, not only testified that he diagnosed Mr. Conroy with alcohol abuse, but also testified that he repeatedly told Mr. Conroy to cut down on his drinking.

Dr. Green testified that on June 15, 2012, Mr. Conroy told him that he drank

Sedgwick LLP

12-15 beers per day, he had done so for many years, and he knew he should cut down.  (Rolstad Decl., ¶ 9, Ex. D at 8:21–23; 9:19–10:17.)  <u>Dr. Green testified that telling a patient to cut back is treatment for alcohol abuse</u>.  (Rolstad Decl., ¶ 9, Ex. D at 10:18–21.)  Dr. Green testified that he had a 25-minute conversation with Mr. Conroy with more than half of that time spent talking about Mr. Conroy's alcohol use and stress in his work situation.  (Rolstad Decl., ¶ 9, Ex. D at 13:8–14.)  Dr. Green testified that he "would have told him that he thought the amount of alcohol that he was drinking was excessive and that he needed to cut back."  (Rolstad Decl., ¶ 9, Ex. D at 14:1–11.)

Dr. Green testified that on August 8, 2012 he diagnosed Mr. Conroy with alcohol abuse, and it was his custom and practice to discuss his alcohol abuse assessment with Mr. Conroy.  (Rolstad Decl., ¶ 9, Ex. D at 16:15–17:7.)  Dr. Green testified that on May 17, 2013 Mr. Conroy told him that he had cut his alcohol down to about two beers per day. (Rolstad Decl., ¶ 9, Ex. D at 17:11–19.)

Dr. Green testified that on another appointment he discussed health education issues, including alcohol.   (Rolstad Decl., ¶ 9, Ex. D at 21:21–23:1)  Dr. Green testified that he referred Mr. Conroy to a dietician, and that the dietician discussed decreasing Mr. Conroy's alcohol use.  (Rolstad Decl., ¶ 9, Ex. D at 23:24–25:8.)

Dr. Green had another "long talk" with Mr. Conroy on January 31, 1997 in which he discussed the amount of his drinking.  (Rolstad Decl., ¶ 9, Ex. D at 27:21–25; 29:8–18.)  Dr. Green had this "long talk" because he found several different physical signs of Mr. Conroy's alcohol abuse, and told Mr. Conroy that these physical signs were due to his alcohol abuse. (Rolstad Decl., ¶ 9, Ex. D at 29:19–30:11.)

Dr. Green testified that he instructed his medical assistant on about April 18, 2007 to tell Mr. Conroy to "work on decreasing alcohol," and that the medical records indicate that the assistant performed this task. (Rolstad Decl., ¶ 8, Ex. C at CONROY 001127 and ¶ 9, Ex. D at 33:15–35:19)  Dr. Green testified that Mr.

Sedgwick LLP

Conroy knew the plan was to decrease alcohol and get follow-up testing.  (Rolstad Decl., ¶ 9, Ex. D at 37:4–9.)

### (b)    Dr. Zucker's Testimony

HCC Life's expert, Dr. Zucker, testified that after reviewing Mr. Conroy's medical records, he concluded that those records clearly show that Mr. Conroy was

> aware that he had a diagnosis of alcoholism; had received recommendations for treatment as well as a form of treatment; was suffering from the consequences of his alcoholism; and, therefore, the statement on the application that he had never been told of this diagnosis, treatment or received any medications for it was incorrect.

(Rolstad Decl., ¶ 10, Ex. E at 29:14–22.)

Dr. Zucker based his opinion that Mr. Conroy knew he had been diagnosed with alcohol abuse on the many medical records showing that Mr. Conroy was counseled concerning his alcohol abuse, showed physical signs of alcohol abuse, and was cautioned to cut back.  (Rolstad Decl., ¶ 10, Ex. E at 33:9–34:3.)  Dr. Zucker testified that the medical records show that Mr. Conroy was well aware that he had been informed of an alcohol problem, recommended treatment, explained the consequences of his severe and life-threatening problem.  (Rolstad Decl., ¶ 10, Ex. E at 50:1–20.)  Dr. Zucker testified that Mr. Conroy qualified for the diagnosis of substance use disorder, alcohol use disorder (severe), and substance abuse disorder, as well as dependence.  (Rolstad Decl., ¶ 10, Ex. E at 36:15-19.)  Dr. Zucker testified that these diagnoses were supported by the extent of Mr. Conroy's alcohol intake ("over 40 years of an extraordinary amount of alcohol reported in many of the documents as 12 to 15 beers a day") and the consequences of his drinking (physicians informed Mr. Conroy that his health problems such as hypertension, hyper lipidemia, altered liver function, and malnutrition) were related to his alcoholism.  (Rolstad Decl. at ¶ 10, Ex. E at 36:21–37:10, 44:8–20.)  Dr. Zucker also testified that Mr. Conroy's function was harmed due to his alcohol abuse in that his family was hesitant to leave their child in his presence because of alcohol.  (Rolstad Decl., ¶ 10, Ex. E at 37:17–37:22, 44:20–45:8)

Sedgwick

Dr. Zucker testified that Mr. Conroy was recommended to cut back on his alcohol consumption, and the records show that he may have tried, but ultimately he was not able to, resulting in DTs (delirium tremens) "which is a life-threatening form of withdrawal from alcohol." The DTs evidenced Mr. Conroy's alcohol dependence. (Rolstad Decl., ¶ 10, Ex. E at 37:23–38:6, 39:16–24.) Dr. Zucker also testified that many of Mr. Conroy's medical problems were, in his opinion, due to his alcohol abuse, including his hypertension, hyperlipidemia, and elevated liver enzyme. (Rolstad Decl., ¶ 10, Ex. E at 40:1–4, 40:12–14.)

Dr. Zucker testified that Mr. Conroy falsified his insurance application when he claimed that nobody used the exact terms "diagnosis" or "alcohol abuse," because "it was clear from the records that he did have prior knowledge, and to state that he didn't was an act of falsification." A doctor does not always say "your diagnosis is" when explaining that you have an illness. Telling a patient that he or she has an alcohol problem and needs to cut back constitutes having explained to the patient that they have an illness. (Rolstad Decl., ¶ 10, Ex. E at 41:3–20, 42:4–43:1.)

### (c)    Mr. Conroy's Testimony

Mr. Conroy testified that he discussed his drinking with Dr. Green in June of 2012, and told him that he drank about 4-6 beers per day. (Rolstad Decl., ¶ 11, Ex. F at 10:11–11:10.) Mr. Conroy's alcohol consumption came up as a topic of discussion with Dr. Green during all of his appointments for more than ten years. (Rolstad Decl., ¶ 11, Ex. F at 12:13–22.) Dr. Green told Mr. Conroy that he should cut back on his alcohol consumption. (Rolstad Decl., ¶ 11, Ex. F at 13:1–5.) Mr. Conroy testified that he started drinking when he was about 20, and that the amount he drank varied. (Rolstad Decl., ¶ 11, Ex. F at 18:9–22.) Mr. Conroy testified that he told Dr. Green he had reduced the amount he was drinking, and that he had indeed cut back. (Rolstad Decl., ¶ 11, Ex. F at 19:8–23.) Mr. Conroy admitted that there were times when he would cut back on his intake of alcohol at the suggestion of Dr. Green but later he increased his intake again. (Rolstad Decl., ¶ 11, Ex. F at

28:12–15.)

### (d)   Mrs. Conroy's Testimony

Mrs. Conroy initially testified that she and Mr. Conroy "drink socially," and that, because of his shoulder, "he drank more because of the pain." (Rolstad Decl., ¶ 12, Ex. G at 23:9–23; 24:9–17.) Later in the deposition, Mrs. Conroy admitted that Mr. Conroy primarily drank at home rather than socially. (Rolstad Decl., ¶ 12, Ex. G at 104:21–107:16.) Mrs. Conroy testified that, during a typical day during the four-year period when their son lived with them, Mr. Conroy would start drinking at about 4:00 in the afternoon. (Rolstad Decl., ¶ 12, Ex. G at 27:10–17.) During this period, she was aware that Mr. Conroy drank more than three beers in a single day, but when asked whether she saw him drink more than four beers, she replied "I don't really count." (Rolstad Decl., ¶ 12, Ex. G at 28:9–20.) Mrs. Conroy testified that Mr. Conroy stopped drinking after his hospitalization because he "doesn't want to have another heart attack." (Rolstad Decl., ¶ 12, Ex. G at 75:19–21.) Mrs. Conroy testified that after the hospitalization a doctor recommended that Mr. Conroy stop drinking and smoking. (Rolstad Decl., ¶ 12, Ex. G at 76:11–12; 77:6–10.)

### F.   Newly-Discovered Evidence Shows Mr. Conroy Knew About his Degenerative Disc Disease Diagnosis and Treatment

Newly-discovered evidence shows that Mr. Conroy knew he had been diagnosed or treated for DJD, and intentionally misrepresented that he had not been so diagnosed and treated. This evidence demonstrates that HCC Life is entitled to rescission as a matter of law.

#### 1.   Mr. Conroy's Employer Discussed Dr. Murphy's February 2014 Report with Mr. Conroy

Newly-produced records relating to Mr. Conroy's workers' compensation claim demonstrate that Mr. Conroy knew the contents of Dr. Murphy's QME report that included a DJD diagnosis.

Sedgwick LLP

On March 6, 2017, defendants produced a June 18, 2014 letter from Mr. Conroy's employer that says Mr. Conroy read and discussed Dr. Murphy's February 2014 report – which described Mr. Conroy's DJD – with human relations manager Rita Weinblatt.  The letter says that two days earlier Ms. Weinblatt and Mr. Conroy "discussed your status and the most recent medical documentation (the February 2014 report from Dr. Murphy) indicating your permanent restrictions."  This letter demonstrates that Mr. Conroy knew he suffered from DJD.  (Rolstad Decl., ¶13, Ex. H (CONROY 000489).)

### 2.    Medical Records Show Mr. Conroy was Treated for and Diagnosed with Degenerative Disc Disease

Newly-discovered medical records demonstrate that Mr. Conroy knew he had been diagnosed with and was treated for DJD.  An August 8, 2012 report concerning a view of the cervical spine showed degeneration of the C5-6 and C6-7 intervertebral disc spaces.  (Rolstad Decl., ¶ 14, Ex. I at CONROY 001038.)  An October 31, 2012 report prepared by Dr. Thomas W. Harris concerning his initial orthopedic consultation with Mr. Conroy states that Mr. Conroy's x-rays showed "severe degenerative changes" to the cervical spine.  (Rolstad Decl., ¶ 14, Ex. I at CONROY 000818).  Notes from a March 13, 2013 appointment indicate that Mr. Conroy received physical therapy for his cervical DJD.  (Rolstad Decl., ¶ 14, Ex. I at CONROY 000925.)  A July 6, 2012 radiographic evaluation showed degenerative changes at C4-5 and C6-7.  (Rolstad Decl., ¶ 14, Ex. I at CONROY 001044).

### 3.    Dr. Murphy Testified that Mr. Conroy was Diagnosed, Treated, and Informed of His Degenerative Disc Disease

Dr. Murphy's testimony demonstrates that Mr. Conroy knew he had experienced symptoms of DJD, was diagnosed with DJD, and received treatment in the form of physical therapy for this disorder before he applied for insurance with HCC Life.  His statement that he had never been diagnosed with DJD was an intentional misrepresentation of material fact providing HCC Life with grounds to

1  rescind the policy.

2       Dr. Murphy is an orthopedic surgeon and the Qualified Medical Examiner

3  ("QME") who prepared Mr. Conroy's QME reports for his workers' compensation

4  case (Rolstad Decl., ¶ 15, Ex. J at 6:21-23, 8:2–3, 10:1–3.)  Dr. Murphy testified that

5  Mr. Conroy had DJD.  (Rolstad Decl., ¶ 15, Ex. J at 23:5–10, 23:25–24:2; 42:10–

6  14.)  A person with DJD would exhibit subjective complaints of stiffness, pain, and

7  headaches.  (Rolstad Decl., ¶ 15, Ex. J at 17:19–22.)  Dr. Murphy testified that,

8  based on his review of Mr. Conroy's medical records, Mr. Conroy experienced neck

9  pain.  (Rolstad Decl., ¶ 15, Ex. J at 20:18–21:7; 28:10–20; 36:12–18; 37:4–10.)  Dr.

10  Murphy testified that the appropriate treatment for DJD includes physical therapy.

11  (Rolstad Decl., ¶ 15, Ex. J at 16:12–19; 46:24–47:9.)  Dr. Murphy testified that Mr.

12  Conroy received physical therapy to treat his neck pain. (Rolstad Decl., ¶ 15, Ex. J

13  at 20:2–5; 29:4-9.)  Dr. Murphy's testimony demonstrates that Mr. Conroy was

14  diagnosed with DJD, experienced the subjective symptoms of DJD, and received

15  physical therapy to treat that condition.  Mr. Conroy's misrepresentation that he had

16  never been diagnosed with or treated for DJD was intentional, and HCC Life is

17  entitled to rescind the policy as a matter of law.

18       **4.     Mr. Conroy Testified that he Received at Least Two of Dr.**

19             **Murphy's Reports**

20       Mr. Conroy testified that he received at least two of Dr. Murphy's reports, all

21  of which contained Mr. Conroy's DJD diagnosis.  This admission demonstrates Mr.

22  Conroy's knowledge of and intentional misrepresentation concerning that diagnosis,

23  entitling HCC Life to rescind the policy as a matter of law.

24       Mr. Conroy testified that he received two of the three reports Dr. Murphy

25  completed in connection with his workers' compensation case.  (Rolstad Decl., ¶ 11,

26  Ex. F at 57:12–21.)  In all three workers' compensation reports, Dr. Murphy noted

27  Mr. Conroy's DJD diagnosis.  (Declaration of Jon Padgett in Support of Motion for

28  Summary Judgment, Docket No. 30-6, Ex. G.)  Mr. Conroy's admission

1   demonstrates that he intentionally misrepresented his health in response to specific

2   questions asked by HCC Life in its insurance application.  HCC Life is entitled to

3   rescind the policy as a matter of law.

4             **5.**      **Dr. Lewis Testified that Mr. Conroy was Diagnosed and**

5                     **Treated for Degenerative Disc Disease and Herniation, and**

6                     **Knew his Diagnosis**

7         Dr. Moshe Lewis testified that Mr. Conroy was diagnosed with and received

8   treatment for DJD, and that Mr. Conroy would have known of this diagnosis and

9   treatment.

10         At his deposition on March 14, 2017, Dr. Lewis testified that Mr. Conroy's

11   medical records clearly delineated a history of DJD.  (Rolstad Decl., ¶ 16, Ex. K at

12   39:6–10.)  Dr. Lewis also testified that Mr. Conroy had signs and symptoms of DJD,

13   including neck pain and pain and weakness in his arm.  (Rolstad Decl., ¶ 16, Ex. K

14   at 55:10–56:4, 69:13–70:5.)  Dr. Lewis also testified that Mr. Conroy received

15   physical therapy, and that physical therapy is commonly used to treat DJD.  (Rolstad

16   Decl., ¶ 16, Ex. K at 58:15–59:6; 59:19–60:2; 70:13–22.)

17         Dr. Lewis testified that, "based on the amount of time that Mr. Conroy had

18   had neck pain, the persistence of other related complaints to the neck, that

19   [defendants] should have disclosed that issues as relates to the neck had been

20   diagnosed and treated."  (Rolstad Decl., ¶ 16, Ex. K at 78:15–21.)  Dr. Lewis

21   testified that Mr. Conroy's "extensive history" of complaints regarding the neck and

22   the extent of workup and treatment, provided a "significant basis for an awareness"

23   of Mr. Conroy's DJD.  (Rolstad Decl., ¶ 16, Ex. K at 79:15–80:10.)  Dr. Lewis

24   testified that he believed Mr. Conroy knew of his diagnosis because it would have

25   been malpractice for his doctors to fail to provide him with that diagnosis as it

26   related to his complaints.  (Rolstad Decl., ¶ 16, Ex. K at 83:8–24.)  Dr. Lewis

27   testified that defendants should have disclosed Mr. Conroy's diagnosis of and

28   treatment for DJD by answering question no. 3 in their application for insurance

Sedgwick LLP

1  with HCC Life in the affirmative.  (Rolstad Decl., ¶ 16, Ex. K at 85:6–13.)  Dr.

2  Lewis testified that given that Mr. Conroy's diagnosis and treatment for DJD went

3  on for multiple years and involved multiple doctor visits, it was unreasonable to

4  expect that Mr. Conroy was not aware of his DJD diagnosis when he applied for

5  insurance with HCC Life.  (Rolstad Decl., ¶ 16, Ex. K at 94:2–18; 98:4–15; 99:17–

6  21.)

### 6.     Dr. Zucker's Testimony

8        HCC Life's expert, Dr. Zucker, testified that after reviewing Mr. Conroy's

9  medical records, he concluded that

> The claim on the application that [Mr. Conroy] had never been told of
> degenerative disk [sic] disease was not accurate because there were
> multiple entries in various records that show that he had been
> diagnosed, that he was aware of the diagnosis, had received treatment
> for the diagnosis.

13  (Rolstad Decl., ¶ 10, Ex. E at 29:23–30:3.)

## III.   <u>Argument</u>

15        HCC Life's motion for reconsideration should be granted because newly-

16  discovered evidence that demonstrates Mr. Conroy knew he had been diagnosed

17  with and treated for alcohol abuse and DJD.  HCC Life exercised due diligence to

18  discover the evidence, the evidence is material, and had the Court been aware of the

19  evidence it would have granted HCC Life's motion for summary judgment.

20        In addition, Mr. Conroy's declaration in opposition to HCC Life's MSJ is

21  insufficient to create a triable issue of material fact.  HCC Life is not required to

22  show that Mr. Conroy was informed he had been diagnosed with alcohol abuse or

23  DJD.  Evidence is sufficient to show that the insured knew about his ailment when

24  the ailment had been diagnosed more than once and existed over a multi-year

25  period.

26        Finally, Mr. Conroy's declaration is insufficient to create a triable issue of

27  fact because it is internally inconsistent, inconsistent with Mr. Conroy's deposition

28  testimony, and not only uncorroborated by contradicted by the evidence newly

Sedgwick LLP

obtained in this case.

### A. Newly-Discovered Evidence Demonstrates Reconsideration is Appropriate in this Case

A motion for reconsideration may be brought under Fed. R. Civ. Proc. 60(b)(1) on the basis of newly-discovered evidence. "A party is entitled to relief under Rule 60(b)(2) from an order of summary judgment where (1) the evidence was discovered after the summary judgment hearing; (2) the moving party exercised due diligence to discover the evidence; (3) the evidence is material and not merely cumulative or impeaching; and (4) a new hearing considering the evidence would probably produce a different result." *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1535 (8th Cir. 1996). A motion under Rule 60(b) must be made within a reasonable time, and no more than a year after the entry of the order. Fed. R. Civ. P. 60(c)(1). HCC Life's motion is timely because it is brought 16 days after the Court entered an order denying HCC Life's motion for summary judgment.

HCC Life's motion for reconsideration should be granted because evidence was developed through discovery after briefing on the summary judgment was complete and therefore was not before the Court. HCC Life had no opportunity to provide the Court with the newly-considered evidence before the Court issued its ruling in part because there was no hearing on the motion. Defendants produced the evidence on March 6, 2017, and HCC Life took depositions that addressed that evidence between March 7, 2017 and March 15, 2017. (Rolstad Decl. at ¶¶ 3–4.) The Court issued an order denying HCC Life's August 26, 2016 motion for summary judgment on March 22, 2017, only sixteen days after HCC Life discovered the new evidence, and only 7 days after the last deposition concerning that evidence. (Docket No. 65.)

HCC Life was also diligent in seeking the newly-discovered evidence. HCC Life propounded requests for interrogatories, requests for production, and requests for admission on about August 10, 2016. Defendants responded on October 14,

1   2016 and produced almost 750 pages of documents in response.  HCC Life also

2   issued subpoenas to eleven medical providers in order to obtain additional

3   documents.  (Rolstad Decl. at ¶ 2.)  Despite these efforts, on March 6, 2017,

4   defendants produced 572 pages of documents, many of which HCC Life had never

5   seen before, as responsive to the requests for production.  (Rolstad Decl. at ¶ 3.)

6   These late-produced documents, and the deposition transcripts which became newly

7   available, support the motion for summary judgment.

8        HCC Life's newly-discovered evidence is material and supports that a new

9   hearing considering the new evidence would produce a different result.  First, Mr.

10  Conroy's letter to his doctors at Sharp instructing them to redact all records

11  mentioning alcohol if his employer were to seek those records demonstrates Mr.

12  Conroy's knowledge of and effort to conceal his alcohol abuse.  Medical records

13  demonstrate that Mr. Conroy had been diagnosed with and treated for alcohol abuse

14  as early as 1992.  These medical records also show that Mr. Conroy experienced

15  serious complications from his alcohol abuse, including alcohol-related

16  hyperlipidemia, ecchymosis, and impaired liver function.  Second, a letter from Mr.

17  Conroy's employer demonstrates that Mr. Conroy received and discussed Dr.

18  Murphy's QME report with his employer, and his long history of treatment for DJD

19  shows his knowledge that he had this condition.  These records are material to the

20  question whether Mr. Conroy's long history of alcohol abuse and DJD demonstrates

21  that he made intentional misrepresentations of material fact on his application for

22  insurance, and had HCC Life had an opportunity to present this evidence earlier, the

23  Court would have issued a ruling in HCC Life's favor.

24  **B.    Newly-Discovered Evidence Shows Mr. Conroy Knew He Had**

25  **Been Treated For and Diagnosed With Alcohol Abuse**

26       Mr. Conroy's declaration that he did not "recall any discussions with any

27  medical providers wherein I was informed that I had been diagnosed with alcohol

28  abuse" and was never referred to "alcohol abuse treatment or counseling," does not

create a triable issue of fact as to whether Mr. Conroy misrepresented his health history in response to HCC Life's questions about that history.  Newly-discovered evidence, including Mr. Conroy's own deposition testimony, demonstrates Mr. Conroy's alcohol abuse was diagnosed more than once and existed over a multi-year period, and for that reason summary judgment in HCC Life's favor should be granted.  In addition, the declaration does not create a triable issue of fact because it is inconsistent with Mr. Conroy's testimony.  The declaration is also insufficient to create a triable issue of fact because it is not only uncorroborated but contrary to all of the available evidence:  Dr. Green testified that he repeatedly counseled Mr. Conroy concerning his alcohol abuse and treated him by telling him to cut back.  Newly-produced medical records support Dr. Green's testimony and flatly contradict Mr. Conroy's declaration.

### 1.   HCC Life Does not Need to Prove Mr. Conroy was Informed he was Diagnosed with "Alcohol Abuse"

An insurer may rescind a policy when the insured has misrepresented or concealed material information in connection with obtaining insurance.  *Salkin v. USAA Life Ins. Co.*, 544 F. App'x 713, 714 (9th Cir. 2013); *Nieto v. Blue Shield of California Life & Health Ins. Co.,* 181 Cal. App. 4th 60, 75 (2010).  The Insurance Code imposes "heavy burdens of disclosure" on the parties to an insurance contract, and misrepresentation or concealment of a material fact permits a party to the contract to rescind.  *Salkin, supra,* 544 Fed. App'x at 714; *Nieto, supra,* 181 Cal. App. 4th at 76.

The law does not require HCC Life to demonstrate that Mr. Conroy was "*informed*… [he] had been diagnosed with alcohol abuse." (Docket No. 45-3, Conroy Decl., at ¶ 12; Order at pp. 11–12.)  "Evidence supports the conclusion that [an insured] knew about his ailment… [when the] ailments appear to have been diagnosed more than once and to have existed over a multi-year period." *Tran v. Kansas City Life Ins. Co.*, No. 2:15-cv-09963-ODW (RAOx), 2017 WL 58826, at

Sedgwick

1   *5, 2017 U.S. Dist. LEXIS 1697, (C.D. Cal. Jan. 5, 2017), judgment entered, 2017

2   WL 380901, 2017 U.S. Dist. LEXIS 15800 (C.D. Cal. Jan. 25, 2017) (insurer

3   entitled to summary judgment on rescission defense when the evidence showed the

4   insured had a long history of diabetes), citing *Philp v. Jackson Nat. Life Ins. Co.*,

5   107 F.3d 878 (9th Cir. 1997) (unpublished) (insured's "long medical history that

6   was contrary to the answers he gave on the application" were grounds for rescission

7   even if insured "did not appreciate the significance of his medical conditions").

8       Newly-discovered medical records and testimony demonstrate that Mr.

9   Conroy received counseling and treatment for alcohol abuse on numerous occasions

10   for the last 20 years before he experienced delirium tremens at the hospital.  Dr.

11   Green testified that he repeatedly told Mr. Conroy to cut down on his drinking, and

12   telling a patient to cut down is a form of treatment.  Mr. Conroy admits that he was

13   told to cut back.  (Docket No. 45-3, Conroy Decl., at ¶ 12.)  Dr. Green had at least

14   one long talk with Mr. Conroy about his alcohol use because of the effect it was

15   having on his health.  Mr. Conroy suffered from alcohol-related hyperlipidemia,

16   ecchymosis, and impaired liver function, and was counseled about this by his

17   doctor.  Mr. Conroy instructed his medical providers to conceal his alcohol abuse

18   from third parties who sought his medical records.  Mr. Conroy's failure to disclose

19   his long and significant medical history of alcohol abuse are grounds for rescission

20   even if he did not recall being told he had been diagnosed with alcohol abuse.  Mr.

21   Conroy's failure to disclose his lengthy history of severe alcohol abuse, and his

22   efforts to conceal that history, entitles HCC Life to rescind the policy as a matter of

23   law.

24       In his declaration, Mr. Conroy said that he "did not recall any discussions

25   with his medical providers wherein [he] was informed that [he] had been diagnosed

26   with alcohol abuse."  (Docket No. 45-3, Conroy Decl., at ¶ 12.)  Even if Mr.

27   Conroy's medical providers did not use the term "alcohol abuse," Mr. Conroy

28   understood that he had been told for more than 20 years that his drinking was so

Sedgwick

1   excessive that he was showing physical signs of alcohol abuse.  Dr. Green testified

2   and newly-produced medical records show that Dr. Green discussed Mr. Conroy's

3   excessive alcohol use during multiple long talks.  Mr. Conroy admitted that he

4   attempted to reduce his drinking in response to Dr. Green's instructions.  (Rolstad

5   Decl., ¶¶ 9, 11, Exs. D, F.)

6                  **2.     Mr. Conroy's Declaration is Insufficient to Create a Triable**

7                          **Issue of Fact Because it is Internally Inconsistent and Lacks**

8                          **Supporting Evidence**

9           A party's conclusory and self-serving declarations, "lacking detailed facts and

10  any supporting evidence" are insufficient to create a genuine issue of material fact.

11  *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497–498 (9th Cir. Cal. 2015), quoting

12  *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir.1997).  In

13  *Nigro,* the court found a declaration to be sufficient to create an issue of material

14  fact because it was internally consistent.  By contrast, based on Dr. Green's

15  testimony that being told to cut back is treatment for alcohol abuse, Mr. Conroy's

16  declaration is internally inconsistent.  In addition, his declaration is not is not only

17  uncorroborated but directly contradicted by his medical records and the testimony of

18  his primary care physician, Dr. Green.

19                     **(a)     Mr. Conroy's Declaration is Internally Inconsistent**

20          The court's holding in *Nigro, supra,* is distinguishable from the present case.

21  In *Nigro,* the court held that the plaintiff's declaration and deposition testimony

22  were sufficient to create a genuine dispute of material fact because his testimony

23  was "based on personal knowledge, legally relevant, and internally consistent."

24  *Nigro, supra,* 784 F.3d at 498.

25          Unlike the declaration in *Nigro*, Mr. Conroy's declaration is insufficient to

26  create a triable issue of material fact because it is internally inconsistent.  Mr.

27  Conroy contends that he was not treated for alcohol abuse, but he admits that he was

28  told to cut back.  (Docket No. 45-3, Conroy Decl., at ¶ 12.)  Dr. Green testified that

being told to cut back is a form of treatment.  (Rolstad Decl., ¶ 9, Ex. D at 10:18–21.)

Mr. Conroy's declaration is also inconsistent with his own deposition testimony.  His declaration says that he was not told he had been diagnosed with alcohol abuse, but at his deposition he admitted that his alcohol consumption was a topic of discussion with Dr. Green during all of his appointments for more than ten years.  It is not necessary that a medical provider use the term "alcohol abuse" for Mr. Conroy to have known that he suffered from this condition.  See *Tran, supra,* 2017 WL 58826, at *5, 2017 U.S. Dist. LEXIS 1697.

### (b)    Mr. Conroy's Declaration Lacks Corroborating Evidence

Like the declaration in *Publishing Clearing House,* Mr. Conroy's declaration is insufficient to create a genuine issue of material fact because it lacks any supporting evidence.  *Publishing, supra,* 104 F.3d at 1171.  Although declarations need not always be supported by corroborating evidence, Mr. Conroy's declaration is insufficient in this case because all of the corroborating evidence Mr. Conroy could have obtained flatly contradicts his declaration.

Mr. Conroy's declaration is distinguishable from the declarations at issue in *SEC v. Phan,* 500 F.3d 895 (9th Cir. 2007).  In *Phan*, the court held that the defendants' two declarations concerning their conversation with each other did not need corroborating evidence because in "most conversations between two people," there is unlikely to be corroborating evidence.  *Id.* at 910.  Here, there was evidence concerning Mr. Conroy's conversations with Dr. Green – including medical records and Dr. Green's own declaration – but defendants did not provide that evidence because it does not corroborate Mr. Conroy's declaration, instead the evidence directly contradicts it.  For example, in his declaration Mr. Conroy states that he was never referred "to any alcohol abuse treatment or counseling."  (Docket No. 45-3, Conroy Decl., at ¶ 12.)  This declaration is not only without corroborating evidence

Sedgwick

1  but is contradicted by Dr. Green's testimony and medical records that show Dr.

2  Green referred Mr. Conroy to a dietician who instructed Mr. Conroy to decrease his

3  alcohol consumption.  (Rolstad Decl., ¶ 9, Ex. D at 23:24–25:8; ¶ 8, Ex. C at

4  CONROY 001011.)

5      **C.**    <u>**Newly-Discovered Evidence Shows Mr. Conroy Knew He Had**</u>

6             <u>**Been Treated for and Diagnosed With DJD**</u>

7       HCC Life's newly-discovered evidence, including a letter from Mr. Conroy

8  from his employer that says the employer discussed Dr. Murphy's findings with Mr.

9  Conroy, demonstrates that Mr. Conroy also knew he had been diagnosed with and

10  treated for DJD.  Mr. Conroy cannot both seek workers' compensation benefits for

11  his degenerative disc disease and also claim that he was not aware that he suffered

12  from the condition.  Mr. Conroy's long history of DJD, his multiple office visits,

13  and his long history of treatment for that condition demonstrate Mr. Conroy's

14  knowledge of his condition.  See *Tran, supra,* 2017 WL 58826, at *5, 2017 U.S.

15  Dist. LEXIS 1697.  His declaration to the contrary is again uncorroborated and

16  contrary to the documents defendants belatedly produced, and for that reason is

17  insufficient to create a triable issue of fact.  See *Publishing, supra,* 104 F.3d at 1171.

18      **D.**    <u>**There is No Evidence to Support Defendants' Bad Faith Claim**</u>

19       To prove a breach of the implied covenant defendants must show that HCC

20  Life's decision to rescind the policy was unreasonable or without proper cause.

21  *Brandwein v. Butler*, 218 Cal. App. 4th 1485, 1514–15 (2013).  Bad faith implies

22  unfair dealing rather than mistaken judgment.  "The ultimate test is whether the

23  insurer's conduct was unreasonable."  *Nieto v. Blue Shield of California Life &*

24  *Health Ins. Co*., 181 Cal. App. 4th 60, 86 (2010).  "If the conduct of the insurer in

25  denying coverage was objectively reasonable, its subjective intent is irrelevant."

26  *Bosetti v. U.S. Life Ins. Co. in City of N.Y*., 175 Cal. App. 4th 1208, 1236 (2009).

27  "There is no cause of action for breach of the covenant of good faith and fair dealing

28  when no benefits are due."  *Brandwein*, *supra*, 218 Cal. App. 4th at 1514–15.

1   In deciding whether there was a genuine dispute as to coverage, "the court
2   does not decide which party is 'right' as to the disputed matter, but only that a
3   reasonable and legitimate dispute actually existed." *Keshish v. Allstate Ins. Co.*, 959
4   F. Supp. 2d 1226, 1234 (C.D. Cal. 2013).

5   HCC Life's decision to rescind the policy was reasonable as a matter of law.
6   Mr. Conroy's long medical history of severe alcohol abuse and DJD set forth in
7   HCC Life's motion for summary judgment demonstrates that rescission was
8   appropriate.  As explained by HCC Life's expert, Dr. Zucker, the entire process was
9   "in good faith on the part of the insurance company in that the process was made
10  completely transparent and aware to Mr. and Mrs. Conroy.  Opportunities for
11  contesting the opinion where [sic] available."  (Rolstad Decl., ¶ 10, Ex. E at 30:5–
12  11.)

13  **IV.**   <u>**Conclusion**</u>

14  HCC Life requests its motion for reconsideration be granted, and that the
15  Court grant HCC Life's motion for summary judgment.

16

17  DATED:  April 7, 2017                        SEDGWICK LLP

18

19

20                                         By:       /s/ Dennis G. Rolstad
                                                  _____
21                                                DENNIS G. ROLSTAD
                                                  ELIZABETH A. TRITTIPO
22                                                Attorneys for Plaintiff
                                                  HCC LIFE INSURANCE COMPANY
23

24

25

26

27

28